[Crim. No. 2718. In Bank.—February 24, 1925.]

## THE PEOPLE, Respondent, v. F. E. McCLENNEGEN et al., Appellants.

[1] APPEAL — ERROR — PRESUMPTIONS.—Upon an appeal, all intendments are in favor of the regularity of the action of the trial court and error will not be presumed but must affirmatively appear, and if there is any substantial evidence in the case by which the verdict of the jury can be supported, it does not lie in the power of the supreme court to disturb the jury's findings on the ground of a failure of evidence to support the judgment.

[2] ID.—EVIDENCE—CREDIBILITY OF WITNESSES—FUNCTION OF JURY.— It is the province of the jury alone, subject to the control of the court and in subordination to the rules of evidence, to judge of the credibility of the witnesses and the effect and value of the evidence addressed to them.

[3] CRIMINAL LAW—EVIDENCE—CHARACTER OF.—Evidence may be indirect as well as direct, and as such it may be sufficiently convincing to justify a verdict of conviction in a criminal action.

[4] ID.—SERIES OF ACTS—PLEADING.—When a statute enumerates a series of acts, either of which separately or altogether may constitute the offense, all of such acts may be charged in a single count, for the reason that notwithstanding each act may, by itself, constitute the offense, all of them together do no more, and likewise constitute but one and the same offense.

[5] ID.—CRIMINAL SYNDICALISM ACT—EVIDENCE.—In a prosecution for violation of the Criminal Syndicalism Act, if the evidence sufficiently supports the sole allegation that the defendants were and remained members of the Industrial Workers of the World, and if it justifies the jury's conclusion that the organization had for its aims and purposes and employed the means and methods for the accomplishment of said aims and purposes denounced by the statute, it is immaterial whether any other act or acts comprising the series of acts set out in the indictment had or had not been proved, as proof of any one of said acts would be sufficient to sustain the convictions.

[6] ID. — SUFFICIENCY OF EVIDENCE—KNOWLEDGE OF UNLAWFUL PURPOSE OF ORGANIZATION.—In such a case where the proof offered to show that the defendants were and had been for a great while prior to the time named in the indictment members of the Indus-

---

3. See 8 R. C. L. 179; 8 Cal. Jur. 190.
4. See 14 R. C. L. 194; 14 Cal. Jur. 61.
6. See 23 Cal. Jur. 1126.

trial Workers of the World was overwhelming, it is unnecessary to determine whether knowledge of the unlawful purposes of the organization on the part of the defendants at the time each one became a member of said organization was a necessary ingredient of the offense, or whether the offense was completed upon his becoming a member without such knowledge.

[7] Id.—Pleading—Sufficiency of Indictment.—In this prosecution for a violation of the Criminal Syndicalism Law of this state it is held that the indictment, which follows the language of the act, is sufficient.

[8] Id.—Conspiracy — Evidence.—To charge a person with being a member of an organization, society, group, or assemblage of persons organized or assembled to advocate and teach, aid or abet, criminal syndicalism, is, in effect, to charge them with conspiring to advocate and teach, or aid and abet criminal syndicalism; and if there is any substantial evidence to show that the defendants acting in concert committed the acts denounced by the statute, the conspiracy charge is established.

[9] Id.—Character of Organization—Evidence—Acts Prior to Passage of Law.—In such a prosecution, evidence of the character of practices indulged in and literature circulated by the organization, although during a period prior to the passage of the Criminal Syndicalism Act, was admissible to establish the character of the organization.

[10] Id.—Evidence—Declarations of Officer of Organization—Admissibility.—In such a case, the observations made by the general secretary-treasurer of the organization in a letter written by him to a local branch which had adopted a resolution providing for the censoring of any literature that had been previously issued condoning or advocating violence, etc., were admissible on the question of whether or not a change had been made in the means and methods of prosecuting the plans of the organization, as contended by the defendants, the question of good faith being involved.

[11] Id. — Purposes of Organization—Quality of Acts—Question for Jury.—In such a prosecution, the purposes sought to be accomplished by the organization, which the defendants were alleged to be members of, were proper matters for the consideration of the jury in determining the quality of the acts of the organization, which, it is claimed, bore a criminal color.

[12] Id.—Anticipation of Collision With the Law.—In such a case it was competent for the jury to consider the fact that the or-

---

7. See 23 Cal. Jur. 1113.
9. See 23 Cal. Jur. 1117.
10. See 23 Cal. Jur. 1118.
11. See 23 Cal. Jur. 1125.

ganization in question anticipated collisions with the law, as evidenced by the creation of a defense fund for which provision was liberally made.

[13] ID.—BRINGING MULTITUDE OF MEN TO CERTAIN POINT—PURPOSE —VIOLATION OF ACT.—If the intent of an organization in bringing a multitude of men to a certain place was to create a state of terrorism by designedly casting idle men in large numbers upon the public during a tumultuous or riotous situation and with the agreement and understanding that general or local laws should be violated by them as a means of filling the jails to overflowing and creating a condition beyond the power of the law officers to cope with and thereby obstructing the administrative arm of the law, as coercive methods, such acts would be in violation of the means and methods prohibited by the Criminal Syndicalism Act, as would a system of threats, intimidation, and molestation agreed upon as a means of accomplishing the purpose of the organization.

[14] ID.—KNOWLEDGE OF UNLAWFUL PURPOSE — POWER OF LEGISLATURE.—The legislature has the power to provide that any person who joins an organization organized for unlawful purposes, whether such person is or is not aware of the unlawful purpose, is guilty of an offense.

[15] ID.—INTENT.—To make a person guilty of an offense, it is not necessary in every instance that such person should have a specific intent to violate law; it is sufficient that he unintentionally commits the forbidden act.

[16] ID.—MISTAKE OF FACT.—A mistake of fact, or a want of intent, is not in every case a sufficient defense for the violation of a criminal statute.

[17] ID.—KNOWLEDGE OF PURPOSES OF ORGANIZATION—EVIDENCE.—In a prosecution for a violation of the Criminal Syndicalism Act of this state, proof of the act of joining an organization shown to be such as the statute denounces is a sufficient showing of knowledge of the purposes of the organization.

[18] ID.—VALIDITY OF ACT.—The objection that the Criminal Syndicalism Act of this state is based on a false and arbitrary classification cannot be maintained.

[19] ID.—EVIDENCE — MOTION TO STRIKE OUT — IMMATERIAL ERROR— APPEAL.—In such a case, even though the trial court might have erred in denying a motion to strike out certain evidence, the judg-

14. Validity of legislation directed against political, social, or industrial propaganda deemed to be of a dangerous tendency, notes, 1 A. L. R. 336; 20 A. L. R. 1535. See, also, 23 Cal. Jur. 1105,

15. See 8 R. C. L. 62; 7 Cal. Jur. 853.

17. See 23 Cal. Jur. 1134.

ment will not be reversed on this ground where it appears that the evidence was merely cumulative, and could not have been prejudicial in the light of the other evidence, and it cannot be said that the verdict of the jury would have been different had the motion been granted.

(1) 17 C. J., p. 213, n. 30, p. 215, n. 32, p. 255, n. 52, 55, p. 271, n. 41.  (2) 16 C. J., p. 930, n. 93.  (3) 16 C. J., p. 762, n. 31, 32. (4) 31 C. J., p. 764, n. 34.  (5) 31 C. J., p. 838, n. 25, 27; 33 C. J., p. 165, n. 93.  (6) 17 C. J., p. 203, n. 85.  (7) 33 C. J., p. 164, n. 91.  (8) 33 C. J., p. 164, n. 91, p. 165, n. 93.  (9) 33 C. J., p. 165, n. 3.  (10) 33 C. J., p. 165, n. 99.  (11) 33 C. J., p. 165, n. 96, 99.  (12) 33 C. J., p. 165, n. 99.  (13) 33 C. J., p. 162, n. 26, p. 163, n. 35 New.  (14) 16 C. J., p. 76, n. 1; 35 C. J., p. 918, n. 73, p. 919, n. 79; 40 Cyc., p. 947, n. 54.  (15) 16 C. J., p. 76, n. 1, p. 78, n. 5.  (16) 1 C. J., p. 1188, n. 30; 16 C. J., p. 76, n. 1, p. 86, n. 17.  (17) 33 C. J., p. 165, n. 93.  (18) 33 C. J., p. 163, n. 34.  (19) 17 C. J., p. 333, n. 78, 81; 33 C. J., p. 165, n. 93.

APPEALS from judgments of the Superior Court of Los Angeles County and from orders denying motions for new trials.  Paul J. McCormick, Judge.  Reversed in part and affirmed in part.

The facts are stated in the opinion of the court.

R. W. Henderson for Appellants.

U. S. Webb, Attorney-General, Erwin W. Widney, Deputy Attorney-General, Asa Keyes, District Attorney, and Tracy Chatfield Becker, Deputy District Attorney, for Respondent.

SEAWELL, J.—The defendants, twenty-seven in number, were jointly accused by an indictment presented against them by the grand jury of the county of Los Angeles of the crime of violating the Criminal Syndicalism Act of this state.  (Stats. 1919, p. 281.)  The indictment contains two separate counts, the first of which is framed under section 2, subdivision 4, of said act, and the second count charges a conspiracy, plan, and agreement to accomplish a change in industrial ownership and control in the existing economic and social system and also to effect political changes in this state and in the United States of America by means and methods denounced by said act.  Defendants were tried jointly and separate verdicts of guilty were returned against

each of them under both counts of the indictment. Judgments were pronounced against sixteen of said defendants on both counts (sentences to run concurrently) and against the remaining eleven on said second count only. The appeal is taken jointly from the judgments of conviction and the orders denying motions for new trials.

Defendants declined the aid of counsel at the trial and elected to defend themselves. Each defendant took part in the conduct of his trial. Three or four of their number acted as general spokesmen for all, and while none professed special training in the law or any knowledge of court procedure, they certainly displayed a degree of skill in the management of the trial and a familiarity with the law of the case and with the general rules of evidence far exceeding that which the average layman might be expected to possess. The defendants requested and were supplied with a daily transcript of the proceedings, and the motions subsequently made by them to strike out certain parts of the evidence which had been improperly admitted, and the pertinency of the instructions which they presented for the guidance of the jury in its deliberations, clearly indicated that they had had the advantage of legal assistance from some source. Besides, the court accorded to them the fullest protection of the law and assisted them upon many occasions in developing and presenting their several defenses. No complaint is made of unfairness on the part of the court in any respect or lack of opportunity to present the several defenses in the fullest possible manner.

One of the grounds of appeal involves the question of the insufficiency of the evidence to support the judgments of conviction. In considering this issue it must be borne in mind that we are a court of appeal, and as such we cannot usurp the functions of the triers of fact. [1] It is a rule well settled by many of the decisions of this court that upon an appeal all intendments are in favor of the regularity of the action of the court below and that error will not be presumed but must affirmatively appear. If there is any substantial evidence in the case by which the verdict of the jury can be supported it does not lie in our power to disturb the jury's findings on the ground of a failure of evidence to support the judgment. The rule is aptly stated in *People* v. *Tom Woo*, 181 Cal. 315, 326 [184 Pac. 389,

393], as follows: "In passing upon this question (sufficiency of the evidence to sustain the verdict) we will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence, it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt. For it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence and before the verdict of the jury which has been approved by the trial court, can be set aside on appeal upon the ground we are discussing, it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below." So in this case the jury reached a verdict upon the evidence presented. [2] It was the province of the jury alone, subject to the control of the court and in subordination to the rules of evidence, to judge of the credibility of the witnesses and the effect and value of the evidence addressed to them. (Code Civ. Proc., sec. 2061.) [3] Evidence may be indirect as well as direct, and as such it may be sufficiently convincing to justify a verdict of conviction in a criminal action. In considering this appeal we are required to keep before us the jury's conclusion, and if it be supported by substantial evidence we are bound by it, and we are not to engage in surmises as to what the conclusions of others may have been had the issue been submitted to them.

The Criminal Syndicalism Act of this state provides as follows:

"Section 1. The term 'criminal syndicalism' as used in this act is hereby defined as any doctrine or precept advocating, teaching or aiding or abetting the commission of crime, sabotage (which word is hereby defined as meaning willful and malicious physical damage or injury to physical property), or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change.

"Section 2. Any person who:

"1. By spoken or written words or personal conduct advocates, teaches or aids and abets criminal syndicalism or the duty, necessity or propriety of committing crime, sabo-

tage, violence or any unlawful method of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change; or

"2. Willfully and deliberately by spoken or written words justifies or attempts to justify criminal syndicalism or the commission or attempt to commit crime, sabotage, violence or unlawful methods of terrorism with intent to approve, advocate or further the doctrine of criminal syndicalism; or

"3. Prints, publishes, edits, issues or circulates or publicly displays any book, paper, pamphlet, document, poster or written or printed matter in any form, containing or carrying written or printed advocacy, teaching, or aid and abetment of, or advising, criminal syndicalism; or

"4. Organizes or assists in organizing, or is or knowingly becomes a member of, any organization, society, group or assemblage of persons organized or assembled to advocate, teach or aid and abet criminal syndicalism; or

"5. Willfully by personal act or conduct, practices or commits any act advised, advocated, taught or aided and abetted by the doctrine or precept of criminal syndicalism, with intent to accomplish a change in industrial ownership or control, or effecting any political change;

"Is guilty of a felony and punishable by imprisonment in the state prison not less than one nor more than fourteen years."

The charging part of the first count of the indictment is substantially in the language of said section 2, subdivision 4, of the act. The allegation is that the defendants, on or about April 18, 1923, in the county of Los Angeles, state of California, "did then and there, willfully, unlawfully and feloniously organize and assist in organizing and knowingly become and were members of an organization, society, group and assemblage of persons known and designated as the Industrial Workers of the World, which Industrial Workers of the World . . . were then and there organized for the purpose of defending, advocating, teaching and abetting criminal syndicalism, sabotage, violence and unlawful methods of terrorism, as a means of accomplishing a change in industrial ownership and control and effecting political changes, all of which is contrary to the form, force and effect of the statutes in such cases made and provided," etc.

**[4]** It is the well-settled rule of law, as restated in *People* v. *Gusti,* 113 Cal. 177 [45 Pac. 263], that "when a statute enumerates a series of acts, either of which separately or all together may constitute the offense, all of such acts may be charged in a single count, for the reason that notwithstanding each act may, by itself, constitute the offense, all of them together do no more, and likewise constitute but one and the same offense." (*People* v. *Gosett,* 93 Cal. 641 [29 Pac. 246]; *People* v. *Harrold,* 84 Cal. 567 [24 Pac. 106]; *People* v. *Frank,* 28 Cal. 507; *People* v. *Shotwell,* 27 Cal. 394; *State* v. *Hennessy,* 114 Wash. 351 [195 Pac. 211]; *State* v. *Laundy,* 103 Or. 443 [204 Pac. 958, 206 Pac. 290].) **[5]** Therefore, if the evidence in the record sufficiently supports the sole allegation that the defendants *were* and remained members of the Industrial Workers of the World, as the evidence abundantly shows, and further, if the evidence justifies the jury's conclusion that the organization had for its aims and purposes and employed the means and methods for the accomplishment of said aims and purposes denounced by the statute, it would then become immaterial whether any other act or acts comprising the series of acts set out in the indictment had or had not been proved. Proof of any one of said acts would be sufficient to sustain the convictions. **[6]** The proof offered to show that the defendants were and had been for a great while prior to the time named in the indictment members of the Industrial Workers of the World was overwhelming. This renders it unnecessary to determine whether knowledge of the unlawful purposes of the organization on the part of the defendants *at the time* each one became a member of said organization was a necessary ingredient of the offense, or whether the offense was complete upon his becoming a member without such knowledge. There is no ground for the claim that the defendants in this case did not have knowledge of the purposes, aims, and objects of the organization of which they were members. Each defendant was an officer under the seal of the organization, known as a delegate, and had been such officer for many months and in some instances for a period of several years prior to the day named in the indictment. As such officer each was authorized to collect dues, initiate new members, solicit memberships, raise moneys for the defense fund and other funds

by the sale of stamps, distribute literature of various kinds issued by the organization and to expound by speech and other methods the purposes sought to be accomplished by the organization and to carry forward its doctrines to universal conquest. Said delegates were in frequent communication with the head officers at Chicago and with the secretaries of "branch unions" in various cities in this state and elsewhere, working for the accomplishment of a definite purpose. Close bonds of fellowship united all active members in a common cause. In view of the facts as disclosed by the evidence in this case, the jury would be justified by every rational rule of human experience in concluding that the defendants had knowledge of the purposes of the organization of which they had been active advocates and defenders for long periods of time. We do not understand that full knowledge of the aims and purposes of the organization and its fundamental principles was denied by any one of the defendants. It was admitted by the defendants at the trial that the organization and the members thereof advocated and endeavored to bring about a change in the industrial ownership and control of the production, consumption, distribution, and exchange of wealth and also to effect a political change, but it was denied that either the organization or the defendants as members advocated any of the means of accomplishing the changes that are denounced by the Criminal Syndicalism Act. The purpose of the organization being admitted the remaining question left for determination on this particular branch of the case is whether the evidence was sufficient to sustain the issue that the means and methods advocated to bring about the designed changes were unlawful within the meaning of said act. We will consider this subject at a later period of the discussion.

The material portions of the second count of the indictment under which all of the defendants were convicted, and to which objection is made, omitting the specific means and methods employed, are as follows:

"And for a further and separate cause of action against the said defendants . . . and being a different statement of the same offense as that charged in Count I of this indictment, the said defendants are accused by the Grand Jury of the County of Los Angeles, State of California, by this indictment of a felony, to-wit, Criminal Syndicalism com-

mitted at and in the county of Los Angeles, State of California, on or about the 18th day of April, 1923, . . . as follows, to-wit: That the said defendants and each of them, . . . and the members of said Industrial Workers of the World, otherwise known as the I. W. W. and sometimes known as the Marine Transport Workers Industrial Union of the I. W. W. by joining and becoming members of said organization, agreed to enter and did enter into a conspiracy scheme, plan and agreement to bring about a change of industrial ownership and control and effecting political changes in the county of Los Angeles, State of California, and the United States of America, and, as a part of said conspiracy, scheme, plan, to use force and violence and unlawful methods of terrorism, sabotage, strikes and boycotts to bring about such changes, and as a part of such plan, scheme, and agreement to teach, advocate, aid and abet, commit and attempt to commit criminal syndicalism, sabotage, violence, unlawful methods of terrorism, strikes and boycotts, as a means of accomplishing a change in industrial ownership and control and effecting political changes, by personal act and conduct of said organization, its members and the defendants herein, did print, publish, edit, issue, distribute, and circulate and publicly display books, papers, pamphlets, documents, posters, and other written and printed matter, to wit: . . . " A list follows, enumerating books, booklets, pamphlets, documents, posters, and other written and printed matter which were issued, circulated, distributed, and displayed by the organization and the defendants. A number of excerpts taken from said books, papers, pamphlets, etc., which, it is claimed, taught, advocated, and defended criminal syndicalism and which aided, advised, and abetted its commission, are set out at large. Both counts of the indictment are attacked as not being legally sufficient. [7] The indictment follows the language of the act and is sufficient. (*People* v. *Steelik,* 187 Cal. 361 [203 Pac. 78] ; *In re McDermott,* 180 Cal. 783 [183 Pac. 437] ; *People* v. *Malley,* 49 Cal. App. 597 [194 Pac. 48] ; *State* v. *Laundy,* 103 Or. 443 [204 Pac. 958, 966, 206 Pac. 290].) The first count of the indictment is broader in terms than the language of subdivision 4, section 2, and alleges that the defendants "did then and there, *willfully, unlawfully* and *feloniously* organize and assist in organizing and *knowingly*

became and were members of an organization,'' etc. The italicized words, excepting the word knowingly, which is taken out of the order in which it appears in the act and so placed as to qualify ''became'' as well as ''were,'' are words supplied by the pleader, and the meaning of the reconstructed clause is equivalent to an allegation that the defendants ''knowingly became and knowingly were'' members of said organization. There can be no doubt but that the first count is sufficient. The second count charges the defendants with the offense of conspiracy. Doubtless the authority upon which the prosecution relied to support that count is section 954 of the Penal Code, which provides that ''The indictment or information may charge two or more different offenses connected together in their commission, or different statements of the same offense, or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more indictments or informations are filed in such cases the court may order them to be consolidated. ... ''

It is the claim of the learned counsel for appellants that the evidence failed to establish the crime of conspiracy. Section 182 of the Penal Code provides that if two or more persons conspire to commit any crime they are guilty of a criminal conspiracy. Section 184 of the Penal Code provides that ''No agreement amounts to a conspiracy unless some act, besides such agreement, be done within this state to effect the object thereof by one or more of the parties to such agreement and the trial of cases of conspiracy may be had in any county in which any such act be done.'' Much of the evidence introduced in the instant case is in character and substance practically the same as the evidence considered in *People* v. *Steelik*, 187 Cal. 361 [203 Pac. 18]; *People* v. *Taylor*, 187 Cal. 378 [203 Pac. 85]; *People* v. *Wright et al.*, 66 Cal. App. 782 [226 Pac. 952]; *People* v. *La Rue*, 62 Cal. App. 276 [216 Pac. 627]; *People* v. *Wagner et al.*, 65 Cal. App. 704 [225 Pac. 464]; *People* v. *Roe*, 58 Cal. App. 690 [209 Pac. 381]; *People* v. *Malley*, 49 Cal. App. 597 [194 Pac. 48]. Three former members of the organization testified as to the means and methods employed by the organization to bring about a change in the industrial ownership and control and effecting political changes, to wit, Coutts, Dymond, and Townsend. They were also witnesses in sev-

eral of the cases above cited, if not in all of them. While it is true that no criminal conspiracy based upon a violation of the act was directly charged in a separate count, or at all, in any of said cases, so far as said decisions disclose, it is nevertheless said in the Steelik case that the defendant was, under the provisions of section 2, subdivision 4, guilty of a conspiracy to commit criminal syndicalism. It is there said: " . . . There was thus evidence before the jury that the defendant had violated section 2, subdivision 4, of the statute, that is, he knowingly belonged to a conspiracy to commit crimes, in furtherance of industrial and political control. . . . " [3] To charge a person with being a member of an organization, society, group, or assemblage of persons organized or assembled to advocate, teach, or aid and abet criminal syndicalism is, in effect, to charge them with conspiring to advocate, teach or aid and abet criminal syndicalism. (*People* v. *Flanagan*, 65 Cal. App. 268 [223 Pac. 1014]; *People* v. *La Rue, supra; People* v. *Steelik, supra.*) If, therefore, there is any substantial evidence to show that the defendants acting in concert committed the acts denounced by the statute the conspiracy charge would be established by a sufficiency of evidence.

It is claimed by appellants that practically all of the written and printed matter, literature, and propaganda printed, published, and circulated by the organization and its members prior to the adoption of the Syndicalism Act was destroyed upon the passage of said act and nothing resembling it in character has since been printed or circulated. It is further claimed that the means and methods formerly advocated or practiced by the organization and its members for the accomplishment of its purposes, if such were in fact criminal, have been discontinued since said act was adopted. In other words, it is insisted by the defendants that there has been a complete change in the means and methods advocated and practiced by said organization in its effort and purpose to bring about said changes, and if unlawful acts or methods were at any time advocated or resorted to prior to the year 1919, no act of a criminal character has since been countenanced, encouraged, advocated, or practiced by the organization or by any of the defendants as members of said organization or otherwise. This was an issue of fact for the jury's consideration.

The transcript of testimony together with the clerk's transcript consists of more than three thousand typewritten pages. Notwithstanding the massiveness of the record we have examined it with care. A *résumé* of the many exhibits alone would fill a large portion of our printed reports. The defendants had upon their person or under their control at the time they were arrested in addition to their credentials, etc., the preamble and the constitution of the organization, and other printed matter in various forms advocating criminal syndicalism and promoting its doctrines, which they were using as propaganda at San Pedro in keeping alive a prolonged and tumultuous strike that was there being conducted by the Marine Transport Workers' Union, a branch of the Industrial Workers of the World, in 1922–1923. The indictment sets out in full the preamble of the organization and a number of excerpts taken from pamphlets, leaflets, papers, and other publications, which were being distributed by the defendants.

The preamble contains the following declaration of the organization's purposes:

"The working class and employing class have nothing in common. There can be no peace as long as hunger and want are found among millions of working people and the few who make up the employing class have all the good things of life.

"Between these two classes a struggle must go on until the workers of the world organize as a class, take possession of the earth and the machinery and production and abolish the wage system.

"We find that the centering of the management of the industries into fewer and fewer hands makes the trade unions unable to cope with the ever-growing power of the employing class. The trade unions foster a state of affairs which allows one set of workers to be pitted against another set of workers in the same industry, thereby helping to defeat one another in wage wars. Moreover, the trade unions aid the employing class to mislead the workers into the belief that the working class has interests in common with their employers.

"These conditions can be changed and the interests of the working class upheld by an organization formed in such a way that all its members in any one industry or in

all industries, if necessary, cease work whenever a strike or lockout is on in any department thereof, thus making an injury to one an injury to all.

"Instead of the conservative motto, 'a fair day's wage for a fair day's work,' we must inscribe on our banner the revolutionary watchword, 'Abolition of the wage system.'

"It is the historic mission of the working class to do away with capitalism. The army of production must be organized not only for the every-day struggle with capitalists but also to carry on production when capitalism shall have been overthrown.

"By organizing industrially we are forming the structure of the new society within the shell of the old."

In making reference to a few of said articles, excerpts, publications, etc., whether the same were incorporated in the indictment or received as evidence in the case, we will refer only to so much of the publications, etc., or such parts of the same as will tend to fairly support the judgments. This is the rule on appeal. In so doing, we do not hold that all of the literature edited, issued, or circulated by the order comes within the ban of the act. Some of it is within the legitimate exercise of the right of liberty of speech and liberty of the press.

The indictment sets out a pamphlet called "The Revolutionary I. W. W.," from which we take the following passages: "We are not satisfied with a fair day's wages for a fair day's work. Such a thing is impossible. Labor produces all wealth. Labor is therefore entitled to all wealth. We are going to do away with capitalism by taking possession of the land and the machinery production. We don't intend to buy them either. The capitalist class took them because it had the power to control the muscle and brain of the working class in industry. Organized, we, the working class, will have the power. With that power we will take back what has been stolen from us. We will demand more and more wages from our employers. We will demand and enforce shorter and shorter hours. As we gain these demands we are diminishing the profits of the boss. We are taking away his power. We are gaining that power for ourselves. . . . We fold our arms. The mills close. Industry is at a standstill. We then make our proposition to our former masters. It is this: We, the workers, have

labored long enough to support idlers. From now on, he who does not toil, neither shall he eat. We tear down to build up. The Industrial Workers of the World are laying the foundation of a new government.

"The Industrial Workers of the World is an international movement. We are 'patriotic' for our class, the working class. We realize that as workers *we have no country.* (Italics ours.) The flags and symbols which once meant great things to us have been seized by our employers. To-day they mean naught to us but oppression and tyranny. . . . The practice of some craft unions is to bar men because of nationality or race. Not so with the I. W. W. . . . In our organization the Caucasian, the Malay, the Mongolian and the Negro are all on the same footing. All are workers and as such their interests are the same. An injury to them is an injury to us."

A pamphlet issued by the organization, entitled "The I. W. W., Its History, Structure and Methods," by Vincent St. John, revised in 1919, was taken from one of the defendants. It contained the following treatise:

"As a revolutionary organization the Industrial Workers of the World aims to use tactics that will get the results sought with the least expenditure of time and energy. The tactics used are determined by the power of the organization to make good in their use. No terms made with an employer are final. All peace so long as the wage system lasts is only a truce. At any favorable opportunity the struggle for more control is renewed.

"As the organization gains control in the industries, and the knowledge among the workers of their power, when properly applied within the industries, becomes more general, the long drawn out strike will be a relic of the past. . . .

"No part of the organization is allowed to enter into time contracts with the employer. Where strikes are used, it aims to paralyze all branches of the industry involved, when the employer can least afford a cessation of work during the busy season and when there are rush orders to be filled. . . .

"During strikes the works are closely picketed and every effort made to persuade workers from taking the place of the strikers. All supplies are shut off from strike-bound shops. All shipments are refused wherever possible. Strike

breakers are also isolated. Illegal interference by the government is resented by *open violation of the government's orders, going to jail en masse,* causing expense to the taxpayers—which is but another name of the employing class. In short, the I. W. W. advocates the *use of militant tactics to the full extent of its power to make good."* (Italics ours.)

The foregoing excerpts contained in the indictments are from publications issued and circulated since 1919.

Great quantities of printed matter consisting of stickerettes, posters, pamphlets, booklets, books, songs, and pronouncements advocating the teachings of the organization and which had formerly been circulated by it were received in evidence. These publications differ in degree as to the directness of the means and methods advisable to be employed in a preconceived effort to supplant the existing form of government by a system of industrial communism. The system of sabotage, which was advocated and practiced in 1917, 1918, and in the early part of 1919, and the destruction of property in the farming, fruit-growing, and industrial areas of the state by fires produced by means of phosphorus compounds of slow combustion called "kitties," which were stealthily placed in inflammable materials and so timed as to give the user an opportunity to be several miles distant from the conflagration at the time the fires started; the nightly expeditions in which long sections of copper wires were cut from transmission poles and sold; threats of driving copper nails into fruit trees unless Ford and Suhr, who were serving terms of imprisonment arising out of the Wheatland riots, were released; demands for the release of all "war prisoners"; warnings against the use of California canned fruits and vegetables by suggestions that much of the pack had been poisoned in its preparation and that it was dangerous to use it; plans and attempts to destroy railroad bridges and to blockade tunnels as a means of stopping transportation; the disabling of engines and machinery of all kinds by the use of emery dust, were again related by witnesses produced by the prosecution. [9] Such evidence, although the alleged acts are placed prior to the adoption of the act, was received as tending to establish the character of the organization and was admissible under the authorities already cited.

As against the claim of appellants that the organization had abandoned the practices that had formerly obtained, the respondent offered evidence bearing upon the conduct of the defendants during the Marine Transport Workers' Industrial Union I. W. W. strike at San Pedro. Some of the literature that defendants were circulating is the same as that which has been put into circulation by the organization and its members for several years past. There is evidence in the record to the effect that words and phrases were used in a cryptic sense to disguise the real meaning which was intended thereby to be conveyed. "Striking on the job," which means, primarily, to do as little work in a day as possible and to do it as inefficiently as possible, is also another way of encouraging the practice of sabotage, which is forbidden by the statute. That phrase, according to some of the witnesses, was not so well understood as the word "sabotage." The picture of a black cat and a wooden shoe appears upon much of the literature and, according to testimony in the case, symbolizes sabotage.

As bearing upon the question whether or not a change had in fact been made by the organization in the means and methods formerly employed, there was placed before the jury a photographic copy of a letter written by the acting general secretary-treasurer under date of April 8, 1919, in reply to a resolution that was passed by the San Francisco branch of the general recruiting union. The justification for the adoption of the resolution was placed upon the ground of necessity "in view of the fact that laws covering 'criminal syndicalism,' aimed ostensibly at the Industrial Workers of the World, were being enacted in various States within the United States of America." The resolution denied that the organization at any time had advocated or practiced sabotage or violence and expressly repudiated such imputation as being unjustly made, and apparently in good faith adopted the following paragraph:

"Be it also resolved, that if any literature containing any word, sentence or paragraph condoning or advocating violence, destruction of, or injury to life or property printed by the general organization or elsewhere, be in our possession for sale or distribution at any time in the future, we hereby order all such objectionable matter censored and taken out; . . ."

The above paragraph is referred to in the reply as section 5. The disapproval of the general secretary-treasurer to this part of the resolution is in the following words:

" . . . In regard to the resolutions I am instructed by the General Executive Board to state that section 5 of the resolution should be struck out entirely, as no part of the organization can order any literature printed by the I. W. W. censored or striken out or destroyed. That is a question for the whole organization to determine. No doubt there will be resolutions on this subject at the coming convention but in the meantime if the intent of this resolution is to be placed on the wall of the halls in California as a camouflage by striking out the word sabotage wherever it occurs and cutting out paragraph 5 it would answer its purpose without placing a part of the organization in a position to do what the whole organization alone has a right to do. I am returning this resolution with those words marked out and 5 clause marked out which should be cut out. Trust the matter will be clear and you will understand the proposition or the need for the same." [10] The observations made by the general secretary-treasurer were properly admitted as affecting the question of whether or not a change had been made in the means and methods of prosecuting the plans of the organization. The question of good faith was involved. The evidence was admissible and relevant to that issue.

"The Industrial Worker," an official organ of the Industrial Workers of the World, recent copies of which were found in the possession of some of the defendants, in its issue of December 30, 1922, contained an article from which we quote in part:

"In Herrin, Illinois, the same game goes on. The coal miners of that little town were shot down by the mine guards imported from Chicago, quite in the good old Ludlow way. This business of imported thugs, mercenaries of the local capitalists killing strikers at their own sweet will received a set back. You can never tell just how far these meek American laborers can be pushed back. Sometimes they yield so often, submit as in Pennsylvania and a hundred other places to having their rights, their lives, their liberties taken away with force and violence, you would say labor is for peace at any price. And then *again*, you think they have raised the price; there is a Centralia, or a Herrin. The Herrin trial

drags on. The prosecution and defense both recognize there is a class war. . . . Labor, conservative and radical, stands back of the Herrin defendants. The time has gone by when the American working class is afraid of bloodshed. In the three years since Centralia, the opinion of the workers of America has turned from a hasty belief in the capitalist side of a labor war in the Herrin sense, to a prejudice in favor of the defendants. Capitalism itself is to blame for this tendency toward violence. . . . There is flying loose enough resentment, enough bitterness, enough wasted rebellion, sporadic, blind, passionate, emotional, to blast capitalism into a dust cloud. Let us hope that in the immediate next few years, the delegates of the I. W. W. will succeed in gathering all these loose rebels into one strong army of revolutionary industrial unionism, turning this blind beating of fists at Herrin and West Virginia into a powerful shoulder to shoulder heave of the submerged masses that will wreck the edifice of capitalism. General strike.

"We have enough power, the question is to harness it. We have enough hate, the problem is to direct it. We have enough courage, the next thing is to think a little. There are enough revolutionists, what we need is organization. . . .

"San Pedro still hankers after a free speech fight. Well, give it to her. . . . There are a lot of pickets in Los Angeles, and more should be on the way. The G. E. B. calls for every foot-loose Wob to sail down to San Pedro and wade in. The struggle was won there once, and papers are being sold openly on the streets. Then the Southern California Edison Company found that the picket line was choking off their supply of scabs, and orders have gone out to the San Pedro police to make trouble with the I. W. W. Give them lots of trouble. Flood the town with I. W. W.'s."

Again, as late as March, 1923, the same newspaper printed the following editorial, entitled, "I. W. W. and the Law.":

"The laws are made by the capitalists, not by the workers. The capitalists try to make everybody think that the people make the laws. This is a lie. The people would not make laws like those that hold workingmen in jail for stating their honest opinions and planning for social improvements. The lawmakers are those robbers that would lose the opportunity to exploit labor if they did not have special laws to protect themselves. These capitalists need the jails, courts, police,

the army and navy to keep the workers from taking for themselves what the workers have produced.

"They need to have the people respect the laws and love their country, because even the police could not hold the workers in slavery if there was not this reverence and respect for the institutions of our master's government.

"So the capitalist class, that is the employers (in the Pacific Northwest, it means more than anything else the Lumber Trust), try to make laws that keep people in slavery and at the same time fool the people into believing that the people, the workers, make the laws. If it were not so, no one would respect the laws that protect private property, created by the public and no one would honor and protect these great robbers, the capitalists.

"The capitalists pretend a mighty reverence for the Constitution of the United States. Capitalists made it a long time ago, and as time goes on, they have had to break it in order to continue the robbery, for they dared not change it very much. To change it would make the people lose respect for it.

"The people, the workers, the producers, especially like the section of the constitution which says, 'The right of free speech shall not be abridged.' It also guarantees the rights of free assemblage and the rights of a free press.

"In order to keep such organizations and individuals as the Industrial Workers of the World from exposing the capitalist's game, from convincing the workers that they are being robbed, it is necessary for the capitalists to break the constitution, to deny the right of free speech, free press and right of assemblage. It is necessary to pass other unconstitutional laws, called criminal syndicalism laws and have the capitalistic courts declare them constitutional, and throw men into prison for long periods of time, because they dared to act according to the constitution which this capitalist class made itself, but which now, in some degree, is against the interests of the great robbers.

"In order to get convictions, it is necessary for these robbers to lie about the I. W. W. and to declare that they advocated the destruction of property, the killing of soldiers and all sorts of unsocial crimes. This paper represents the I. W. W. Let us tell you what the I. W. W. stands for.

"In the first place, even if the I. W. W. did destroy property, it would not be an immoral act, for the property belongs to the workers, they made it, and it is only stolen from them; they can do what they please with it.

"But it is just because this property does belong to the workers, because the workers expect to use the machinery and tools of production to continue their work after the capitalist class shall be forced to put on overalls too, it is just for this reason that the I. W. W. does not and never did advocate the destruction of property. At one time members of the organization did talk of 'sabotage.' By this they meant, 'striking on the job,' doing a short day's work for a short day's pay. Courts have hired special liars and professional witnesses to say that this word means 'destroying property,' so the I. W. W. has been forced to avoid using it. Nowadays we say, 'striking on the job' and nobody can understand that.

"Neither does the I. W. W. advocate an armed insurrection. Here again there would be no moral reason why we should not. If a thief takes your pay check, you have a right to shoot at him to get it back. If the thief also bribes the judge and jury and the legislature, to declare his act legal, he is not the less a thief, because he is a perjurer and a corrupter of public officials likewise.

"But it is not good tactics for a labor union to engage in armed insurrection, and it is not necessary. When we get the workers so well organized that they will say, 'The industries are ours' and refuse to work for bosses at all, there will be no need for revolution. If the CAPITALIST CLASS then attacks US with deadly weapons, that will be another matter.

"The I. W. W. method of taking back the products of the workers for the workers, is to organize industrially and win all we can while organizing. When we are strong enough, we will declare a great general strike and put the boss out of his job. Then the workers will run the industries themselves, hiring managers, as the capitalist does, if that is necessary. The workers will take all the profit for themselves.

"It just happens that we can do all this without breaking any laws. All we need is the right of free speech, guaranteed by the constitution. Therefore we do not break any laws.

195 Cal.—30

"But if organized bandits like the capitalist class succeed in getting unconstitutional ordinances passed, depriving us of our right to free speech, free press and freedom of assembling and organizing and striking, we must continue to do those things just the same."

The "Industrial Solidarity," published in Chicago, Illinois, and the official organ of the Industrial Workers of the World, on February 3, 1923, printed an open letter to all workers, entitled "On to San Pedro. A Call to Action," with the request that all labor papers copy, from which we take the following excerpt:

"Present one solid front to the enemy.

"If you are not craven and foot-loose, even though you might have to quit a job, this call is to you, whether you are an I. W. W., a S. L. P., a member of the Socialist party, a communist, or an intelligent Craft Unionist.

"On to San Pedro, if you possibly can.

"On with your money, if you cannot come.

"We do not want your sympathy, if that is all.

"We need you.

"Come on, you lumber-workers. Let the camp shut-down.

"Why should you care about the profits of the boss or the job he is loaning you, when the class struggle needs you.

"Leave your scrapers, your teams, your excavators you 310 men; 'on to San Pedro' is the slogan for you.

"Come on, you Socialists, and Communistic fellow-workers.

"Come on, you brave union men, whatever be the name."

The foregoing is an urgent call for large numbers of the Industrial Workers of the World to gather at a place of labor congestion and fermentation to effect by their presence or otherwise the result of a labor struggle. Whether the call for men to assemble at a place of trouble was for a lawful or unlawful purpose considered with reference to the hostility of the organization toward the economic and political system of this government was a question properly submitted to the jury. The call was heeded and men assembled in large numbers at San Pedro. Many arrests followed.

A book issued by the authority of the organization and containing I. W. W. songs, calculated to arouse its members to vigorous activity, forms a part of its general publicity plan. This book is entitled "Songs to Fan the Flames of Discontent," and has the express approval of the organiza-

tion. The purpose of the songs seems to be well expressed by the title. The songs contained therein scoff at any pretense of loyalty on the part of citizens to their country and respect generally for the law. No institution escapes bitter denunciation. Belligerency and resistance to law are boldly encouraged. The red flag is exalted and the flag of the nation is depreciated. The Christian religion is blasphemed and its devotees are subjected to invective, satire and ridicule. They are classed as cravens lacking the courage essential to make worthy members of the I. W. W. The songs carry with them a spirit of hatred for all the institutions that are a part of our national life. They are not written with a view of correcting or reforming laws but with a desire to destroy the fabric of our national system.

[11] The purposes sought to be accomplished were proper matters for the consideration of the jury in determining the quality of the acts, which, it is claimed, bore a criminal color. The song-books above referred to were found on one or two of the defendants. They contain the songs approved and published by the organization.

[12] It was also competent for the jury to consider the fact that the organization anticipated collisions with the law as evidenced by the creation of a defense fund for which provision is liberally made. The constitution itself makes provision that the general secretary-treasurer (the executive head of the organization) does not forfeit his office by reason of "being in jail." Of course, the justification of the defense for this provision would be placed upon the ground that its members had been unjustly prosecuted and convicted. These, however, were all questions for the jury's consideration.

[13] If the intent of bringing a multitude of men to San Pedro was to create a state of terrorism by designedly casting idle men in large numbers upon the public during a tumultuous or riotous situation and with the agreement and understanding that general or local laws should be violated by them as a means of filling the jails to overflowing and creating a condition beyond the power of the law officers to cope with and thereby obstructing the administrative arm of the law, as coercive methods (a means advocated in the literature of the organization), such acts would be in violation of the means and methods prohibited by the act. So,

too, if a system of threats, intimidation, and molestation was agreed upon as a means of accomplishing the purpose of the organization, as defined in *Pierce* v. *Stablemen's Union,* 156 Cal. 70 [103 Pac. 324], then both the means and purpose of the organization would be unlawful, and the rule laid down in *Pierce* v. *Stablemen's Union, supra, Parkinson* v. *Building Trades Council,* 154 Cal. 581 [16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550, 98 Pac. 1027], and other decisions of this state which justify the right of employees or laborers to strike and conduct a boycott (provided the means employed are not illegal), would not be applicable to their situation.

The strikes initiated by the Industrial Workers of the World differ on basic principles from the strikes resorted to by the ordinary craft union. No concession in wage disputes is sufficient to satisfy the former. The abolition of the wage-system, as declared by the preamble, is a definite plan of the organization and the strike is resorted to at opportune times as one of the means of bringing about the industrial, economic and political changes which they advocate. One strike is to follow another until the employer is forced to retire. It is a part of a revolutionary plan looking to the accomplishment of the ultimate object.

While it is not absolutely essential to a decision of the instant case that we should determine whether the statute makes it a necessary prerequisite for the prosecution upon the trial to prove, in addition to showing the act of joining the organization—becoming a member—that the defendants had actual knowledge of its character at the time they became members, yet in view of the fact that the point is made and discussed at considerable length, and there being no decision of this court bearing directly on the question, it is proper to give it consideration. The constitutionality of the statute is a question foreclosed by the decisions of this state and many other states. The legislature has absolute power to provide that knowledge of the criminal character of the act or acts prohibited shall be a necessary element of the offense defined or it may dispense with such knowledge altogether.

[14] Unquestionably the legislature had the power to provide that any person who joins an organization organized for unlawful purposes, whether such person is or is not aware of the unlawful purpose, is guilty of an offense.

Section 7, subdivision 1, of the Penal Code of this state, provides:

"The word 'willfully,' when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage."

Subdivision 5, of the same section, defines knowingly, as follows:

"The word 'knowingly' imports only a knowledge that the facts exist which bring the act or omission within the provisions of this code. It does not require any knowledge of the unlawfulness of such act or omission; . . . "

[15] To make a person guilty of an offense, it is not necessary in every instance that such person should have a specific intent to violate law; it is sufficient that he intentionally commits the forbidden act.

The commission of various acts are made punishable under our criminal procedure, even though the doer be ignorant of the fact that the doing of the act constitutes an offense. [16] A mistake of fact, or a want of intent, is not in every case a sufficient defense for the violation of a criminal statute. Statutes enacted for the protection of public morals, public health, and the public peace and safety are apt illustrations of the rule just announced. (*People* v. *Ratz,* 115 Cal. 132 [46 Pac. 915]; *People* v. *Griffin,* 117 Cal. 583 [59 Am. St. Rep. 216, 49 Pac. 711]; *People* v. *Sheffield,* 9 Cal. App. 130 [98 Pac. 67]; *State* v. *Hennessy,* 114 Wash. 351 [195 Pac. 211], and cases cited.) The latter case quotes the following extract from 8 R. C. L., page 62, as a correct statement of law:

"The maxim *actus non facit reum, nisi mens sit rea,* does not always apply to crimes created by statute, and therefore if a criminal intent is not an essential element of a statutory crime, it is not necessary to prove any intent in order to justify a conviction. Whether a criminal intent or guilty knowledge is a necessary element of a statutory offense is a matter of construction to be determined from the language of the statute, in view of its manifest purpose and design. There are many instances in recent times where the Legislature in the exercise of the police power has prohibited, under penalty, the performance of a specific act. The doing

of the inhibited act constitutes the crime, and the moral turpitude or purity of the motive by which it was prompted and knowledge or ignorance of its criminal character are immaterial circumstances on the question of guilt. The only fact to be determined in these cases is whether the defendant did the act. In the interest of the public the burden is placed upon the actor of ascertaining at his peril whether his deed is within the prohibition of any criminal statute." (See, also, 7 Cal. Jur. 852; *In re Ahart,* 172 Cal. 762 [159 Pac. 160]; *People* v. *O'Brien,* 96 Cal. 171 [31 Pac. 45]; 16 C. J. 76.)

There is much force in the observation made by Mr. Presiding Justice Finch in the case of *People* v. *Flanagan, supra,* to the effect that the average man does not ordinarily become affiliated with political or industrial organizations which may affect national welfare without informing himself as to the cardinal principles of such organization. Political and economic experiences justify the observation. The general principles and primary purposes of all organizations, whether political, industrial, benevolent, fraternal, or social, are quite generally known to the public. We agree with what was said in the Flanagan case that: "The intent of the defendants must be determined from their voluntary connection with the conspiracy, viewed in the light of the circumstances which they knew or ought to have known. It must be held that the evidence is sufficient to justify the inference that the defendants had knowledge of the purposes of the organization."

Section 4, the emergency provision of the Criminal Syndicalism Act, is of itself a persuasive argument in favor of a literal interpretation. It provides: "Inasmuch as the act concerns and is necessary to the immediate preservation of the public peace and safety, for the reason that at the present time, large numbers of persons are going from place to place in this state, advocating, teaching and practicing criminal syndicalism, this act shall take effect upon approval by the Governor." The section sounds a note of apprehension from which it may be argued that the legislature was of the opinion that immediate and somewhat drastic steps were necessary to check a menace that was threatening public peace and safety.

[17]  A consideration of the entire subject leads us to the conclusion that proof of the act of joining an organization shown to be such as the statute denounces is a sufficient showing of knowledge of the purposes of the organization. An accused may meet this showing by proof that he was ignorant of its criminal purposes or that he was induced by false or fraudulent representations to become a member of said organization and was ignorant of its purposes. Of course, if he remained a member and became active in teaching and advocating its doctrines, as was done in the instant case, such conduct would itself be evidence of knowledge of its evil purposes.

[18]  Objection is made to the statute on the ground that it is based on a false and arbitrary classification. This objection is fully answered in the case of *State* v. *Hennessy, supra,* in considering the syndicalism law of the state of Washington, in which the same objection was made. It was there pertinently said: ''The Legislature has power to pass all needful police regulations, and so long as such regulations bear with equal weight upon all in like situation or of the same class, they are upheld by the courts. *State* v. *Fraternal Knights and Ladies,* 35 Wash. 338 [77 Pac. 500] ; *State* v. *Nichols,* 28 Wash. 628 [69 Pac. 372] ; *State* v. *Nicolls,* 61 Wash. 142 [Ann. Cas. 1912B, 1088, 112 Pac. 269]. The act is general in its terms and provides that 'whoever' shall do the things there prohibited shall be guilty of a felony. Under this language anyone, no matter what his business association or professional calling might be, who did the things prohibited by the act, would be subject to its provisions.'' See, also, *People* v. *Wagner et al.,* 65 Cal. App. 704 [225 Pac. 464] ; *State* v. *Dingman,* 37 Idaho, 253 [219 Pac. 760].

[19]  F. W. Kelly, a former special agent of the Department of Justice, was a witness for the prosecution and was permitted to testify against the objection of the defendants as to the dynamiting of the Governor's mansion, which occurred on December 19, 1917. In this connection he testified that he visited the Governor's mansion a few days thereafter and it bore the appearance of having been injured by an explosion. He arrested more than a hundred members of the I. W. W. organization. He testified that a box of dynamite was discovered in the possession of

three members of the organization. On cross-examination it developed that his testimony as to dynamite having been found in the possession of said members was hearsay on his part. A motion to strike out all reference made by this witness as to dynamite having been found in the possession of the members above referred to, was made and granted. A sufficient admonition was given by the court to the jury to wholly disregard that portion of his testimony. A motion, somewhat informal, was made to strike out all of the witness' testimony which in anywise referred to the Governor's mansion. This motion was denied. The motion was quite sweeping, but waiving all technical objections that might be made as to the form of the motion and conceding that error was committed in refusing to grant it, we cannot say that the verdict of the jury would have been different had the motion been granted. The record is somewhat replete with alleged acts of violence including the use of dynamite. The evidence objected to was merely cumulative, and could not have produced prejudicial error in the light of the other evidence, which was properly admitted.

In our consideration of the case we have treated the defendants as a group without making an exception as to any one of them. This was done for the sake of convenience. The defendant, J. C. Robinson, a member of the organization, was arrested several days after the indictment was found and no evidence was produced to show that he was within the state on the day the offense is alleged to have been committed, or that he had any connection with the conspiracy in this state prior to the day of his arrest. The judgment and order as to him must be and is reversed. As to the other defendants, the judgments and orders appealed from are affirmed.

Richards, J., Myers, C. J., Waste, J., Shenk, J., and Lennon, J., concurred.

LAWLOR, J., Concurring.—I concur. But assuming without concluding that by the word "knowingly," as it appears in subdivision 4, section 2, of the act, "Any person who . . . knowingly becomes a member of" the organization is meant guilty knowledge of its purposes at the time membership is acquired and that it is a necessary ingredient in that offense, I concur in the affirmance of the judgment

and the order so far as that part of the decision is concerned solely upon the ground that it cannot be maintained that the evidence before the jury including the proof of membership was not sufficient as matter of law to support the implied finding of such guilty knowledge.

Rehearing denied.