[L.A. No. 30258. In Bank. Feb. 6, 1976.]

NOEL C. BLOOM, Plaintiff and Appellant, v.
THE MUNICIPAL COURT FOR THE INGLEWOOD JUDICIAL
DISTRICT OF LOS ANGELES COUNTY,
Defendant and Respondent;
THE PEOPLE, Real Party in Interest and Respondent.

**COUNSEL**

Fleishman, McDaniel, Brown & Weston, David M. Brown and John H. Weston for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Joseph P. Busch, District Attorney, Harry B. Sondheim and Dirk L. Hudson, Deputy District Attorneys, for Real Party in Interest and Respondent.

**OPINION**

**CLARK, J.**—Plaintiff Bloom appeals from a judgment of the Los Angeles Superior Court denying his petition for writ of prohibition to restrain the Inglewood Municipal Court from proceeding on a complaint charging him in the statutory language with violation of section 311.2, subdivision (a), of the Penal Code.[1] We affirm the judgment.

---

[1] Section 311.2. subdivision (a). provides: "Every person who knowingly sends or causes to be sent. or brings or causes to be brought. into this state for sale or distribution. or in this state possesses. prepares. publishes or prints. with intent to distribute or to exhibit to others, or who offers to distribute. distributes. or exhibits to others, any obscene matter is guilty of a misdemeanor." Film was the allegedly obscene matter here.

Hereafter. unless otherwise indicated. all section references are to the Penal Code.

I

■ We first consider a question of appellate jurisdiction raised by the Court of Appeal on its own motion.[2]

The Court of Appeal held that a superior court judgment denying a writ of prohibition to restrain a municipal court prosecution is not appealable, and that the only remedy is a petition in the Court of Appeal for an original writ of prohibition. Treating plaintiff's appeal as a petition for writ of prohibition on which an alternative writ had been issued, the Court of Appeal heard and determined the matter on the merits and denied the peremptory writ. We ordered a hearing and transferred the cause to this court on our own motion.

Prior to revision of the Constitution in 1966, appeals from rulings by the superior courts on petitions for writs of prohibition were expressly included within the appellate jurisdiction of the Courts of Appeal. "The district courts of appeal shall have appellate jurisdiction on appeal from the superior courts . . . in proceedings of . . . prohibition . . . ." (Cal. Const., art. VI, § 4b.)[3] When the judicial article was revised, "detailed references to instances of appellate jurisdiction," except for this court's appellate jurisdiction in death penalty cases, were deleted as "unnecessary." (Cal. Const. Rev. Com., Proposed Rev. of Cal. Const. (Feb. 1966) p. 91.)

Although no longer spelling it out in so many words, article VI still clearly provides that Courts of Appeal have jurisdiction over appeals from superior court judgments in prohibition proceedings. Section 11 provides in part that "courts of appeal have appellate jurisdiction when

---

[2] The granting of a hearing automatically vacated the opinion of the Court of Appeal (Cal. Rules of Court, rule 976 (d)), but because of its importance, we deem it appropriate to discuss the question raised by that court.

[3] Section 4b, paragraph 1, provided in full: "The district courts of appeal shall have appellate jurisdiction on appeal from the superior courts (except in cases in which appellate jurisdiction is given to the supreme court) in all cases at law in which the superior courts are given original jurisdiction; also, in all cases of forcible or unlawful entry or detainer (except such as arise in municipal, or in justices' or other inferior courts); in proceedings in insolvency; in actions to prevent or abate a nuisance; in proceedings of mandamus, certiorari, prohibition, usurpation of office, removal from office, contesting elections, eminent domain, and in such other special proceedings as may be provided by law; also, on questions of law alone, in all criminal cases prosecuted by indictment or information, except where judgment of death has been rendered."

Section 4e provided: "The district courts of appeal shall have appellate jurisdiction on appeal in all cases within the original jurisdiction of the municipal and justice courts, to the extent and in the manner provided for by law."

superior courts have original jurisdiction . . . ." Section 10 provides in part that superior courts "have original jurisdiction in proceedings for extraordinary relief in the nature of . . . prohibition." There is not the slightest indication in the comments of either the Constitution Revision Commission or the Judicial Council that revision of article VI was intended or expected to affect the appellate jurisdiction of the Courts of Appeal in this regard. (Cal. Const. Rev. Com., Proposed Rev. of Cal. Const. (Feb. 1966) pp. 90-91; Judicial Council of Cal., 1967 Rep. to Governor and Legislature, pp. 76-77.)

Analogy to habeas corpus procedure is not persuasive. An order by a superior court denying a writ of habeas corpus can be challenged only by filing a new petition in a higher court, but that rule is statutory. (Pen. Code, § 1506; *People* v. *Griggs* (1967) 67 Cal.2d 314, 317 [61 Cal.Rptr. 641, 431 P.2d 225]; *Loustalot* v. *Superior Court* (1947) 30 Cal.2d 905, 913 [186 P.2d 673].) In contrast, the Code of Civil Procedure makes the statutes pertinent to appeals applicable to writs of prohibition. Section 1110 provides that "The provisions of Part two of this code relative to new trials and appeals, except in so far as they are inconsistent with the provisions of this title, apply to the proceedings mentioned in this title." Prohibition is a proceeding mentioned in chapter 3 of the title. (See 5 Witkin, Cal. Procedure (2d ed.) Extraordinary Writs, § 178, p. 3938, citing *Mellinger* v. *Municipal Court* (1968) 265 Cal.App.2d 843, 845 [71 Cal.Rptr. 535].)

In conclusion, a superior court judgment denying a writ of prohibition to restrain a municipal court prosecution is within the appellate jurisdiction of the Courts of Appeal.

## II

We now consider the merits of plaintiff's appeal.

■ Plaintiff contends California's statutory definition of obscenity (Pen. Code, § 311) is unconstitutionally vague in light of the recent restatement of the constitutional standard in *Miller* v. *California* (1973) 413 U.S. 15 [37 L.Ed.2d 419, 93 S.Ct. 2607]. Plaintiff argues section 311 fails to satisfy *Miller's* requirement that material proscribed as obscene be "specifically defined by the applicable state law, as written or authoritatively construed." (413 U.S. at p. 24 [37 L.Ed.2d at p. 430].) We hold section 311 sufficiently specific "as . . . authoritatively construed."

In *Roth* v. *United States* (1957) 354 U.S. 476, 489 [1 L.Ed.2d 1498, 1509, 77 S.Ct. 1304], the court articulated the following test of obscenity: "[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." In the course of rejecting the claim that obscene materials are protected by the First Amendment, the court in *Roth* observed that "implicit in the history of the First Amendment is the rejection of obscenity as *utterly without redeeming social importance.*" (354 U.S. at p. 484 [1 L.Ed.2d at p. 1507], italics added.) This observation was incorporated into the definition of obscenity by a plurality of the court in *Memoirs* v. *Massachusetts* (1966) 383 U.S. 413, 418 [16 L.Ed.2d 1, 5-6, 86 S.Ct. 975]. "Under [the *Roth*] definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; *and (c) the material is utterly without redeeming social value.*" (Italics added.)

The element added by the *Memoirs* plurality was repudiated by the majority of the court in *Miller* v. *California.* "The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest . . .; (b) whether the work depicts or describes in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. We do not adopt as a constitutional standard the '*utterly* without redeeming social value' test of *Memoirs* v. *Massachusetts,* 383 U.S., at 419; that concept has never commanded the adherance of more than three Justices at one time." (413 U.S. at pp. 24-25 [37 L.Ed.2d at p. 431]; citation and fn. omitted.) "While *Roth* presumed 'obscenity' to be 'utterly without redeeming social importance,' *Memoirs* required that to prove obscenity it must be affirmatively established that the material is '*utterly* without redeeming social value.' Thus, even as they repeated the words of *Roth,* the *Memoirs* plurality produced a drastically altered test that called on the prosecution to prove a negative, i.e., that the material was '*utterly* without redeeming social value'—a burden virtually impossible to discharge under our criminal standards of proof." (413 U.S. at pp. 21-22 [37 L.Ed.2d at p. 429].)

California's statutory definition of obscenity is based on the *Memoirs* plurality test. "Obscene matter" is defined in section 311 as "matter, taken as a whole, the predominant appeal of which to the average person, applying contemporary standards, is to prurient interest, i.e., a shameful or morbid interest in nudity, sex, or excretion; and is matter which taken as a whole goes substantially beyond customary limits of candor in description or representation of such matters; and is matter which taken as a whole is *utterly without redeeming social importance.*" (Italics added.)

Plaintiff may not complain of the fact that California by statute continues to impose a greater burden on the People in an obscenity prosecution than is constitutionally required. In *Hamling* v. *United States* (1974) 418 U.S. 87 [41 L.Ed.2d 590, 94 S.Ct. 2887], the court rejected the contention that revision of the *Memoirs* test in *Miller* meant a pre-*Miller* federal obscenity statute was unconstitutionally vague. "[O]ur opinion in *Miller* plainly indicates that we rejected the *Memoirs* 'social value' formulation, not because it was so vague as to deprive criminal defendants of adequate notice, but instead because it represented a departure from the definition of obscenity in *Roth,* and because in calling on the prosecution to 'prove a negative,' it imposed a '[prosecutorial] burden virtually impossible to discharge' and which was not constitutionally required. 413 U.S., at 22. Since *Miller* permits the imposition of a lesser burden on the prosecution in this phase of the proof of obscenity than did *Memoirs,* and since the jury convicted these petitioners on the basis of an instruction concededly based on the *Memoirs* test, petitioners derive no benefit from the revision of that test in *Miller.*" (418 U.S. at pp. 116-117 [41 L.Ed.2d at p. 620].)

However, plaintiff's vagueness argument is based primarily on part (b) of the *Miller* test—the requirement that material proscribed as obscene depict or describe, in a patently offensive manner, sexual conduct "specifically defined by the applicable state law, as written or authoritatively construed." (*Miller* v. *California, supra,* 413 U.S. at p. 24 [37 L.Ed.2d at p. 430].) The court in *Miller* gave "a few plain examples of what a state statute could define for regulation under part (b)." The examples were "[p]atently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated," and "[p]atently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibitions of the genitals." (413 U.S. at p. 25 [37 L.Ed.2d at p. 431].) Plaintiff contends section 311 is unconstitutionally vague because it lacks such specificity.

Rejecting such a challenge to a pre-*Miller* federal obscenity statute (18 U.S.C. § 1461)[1] in *Hamling* v. *United States, supra,* 418 U.S. 87, the court emphasized: "At no point does *Miller* or any of the other obscenity decisions decided last Term intimate that the constitutionality of pre-*Miller* convictions under statutes such as 18 U.S.C. § 1461 was to be cast in doubt. Indeed, the contrary is readily apparent from the opinions in those cases. We made clear in *Miller,* 413 U.S., at 24 n. 6, that our decision was not intended to hold all state statutes inadequate, and we clearly recognized that existing statutes 'as construed heretofore or hereafter, may well be adequate.' That recognition is emphasized in our opinion in *United States* v. *12 200-ft. Reels of Film,* 413 U.S. 123 (1973)." (418 U.S. at pp. 112-113 [41 L.Ed.2d at pp. 617-618].)

*United States* v. *12 200-ft. Reels of Film* came to the court on appeal from the district court's dismissal of a forfeiture action under title 19 United States Code section 1305, subdivision (a), which statute the district court had found unconstitutional. In vacating the constitutional decision and remanding the case for a determination of the obscenity *vel non* of the materials claimant sought to import, the court stated: "We further note that, while we must leave to state courts the construction of state legislation, we do have a duty to authoritatively construe federal statutes where 'a serious doubt of constitutionality is raised' and ' "a construction of the statute is fairly possible by which the question may be avoided." ' If and when such a 'serious doubt' is raised as to the vagueness of the words 'obscene,' 'lewd,' 'lascivious,' 'filthy,' 'indecent,' or 'immoral' as used to describe regulated material in 19 U.S.C. § 1305 (a) and 18 U.S.C. § 1462, we are prepared to construe such terms as limiting regulated material to patently offensive representations or descriptions of that specific 'hard core' sexual conduct given as examples in *Miller* v. *California,* at 25. Of course, Congress could always define other specific 'hard core' conduct." (413 U.S. at p. 130, fn. 7 [37 L.Ed.2d at p. 507]; citations omitted.)

In *Hamling,* the court similarly construed title 18 United States Code section 1461. "[W]e indicated in *United States* v. *12 200-ft. Reels of Film, supra,* at 130 n. 7, that we were prepared to construe the generic terms in 18 U.S.C. § 1462 to be limited to the sort of 'patently offensive

---

[1] Title 18 United States Code section 1461 declares "obscene, lewd, lascivious, indecent, filthy or vile" material, or advertisements for such material, to be "nonmailable matter." Petitioners were convicted of violating the section by mailing and conspiring to mail an obscene advertisement. The jury was instructed in accordance with the test of the *Memoirs* plurality. (*Hamling* v. *United States, supra,* 418 U.S. at pp. 91-92, 100 [41 L.Ed.2d at pp. 605-606, 610-611].)

representations or descriptions of that specific "hard core" sexual conduct given as examples in *Miller* v. *California.'* We now so construe the companion provision in 18 U.S.C. § 1461, the substantive statute under which this prosecution was brought. As so construed, we do not believe that petitioners' attack on the statute as unconstitutionally vague can be sustained." (418 U.S. at p. 114 [41 L.Ed.2d at pp. 618-619].)

Understanding the lesson of *12 200-ft. Reels* prior to its reiteration in *Hamling,* the Court of Appeal in *People* v. *Enskat* (1973) 33 Cal.App.3d 900 [109 Cal.Rptr. 433] (hg. den.; cert. den., 418 U.S. 937 [41 L.Ed.2d 1172, 94 S.Ct. 3225]), held that section 311, as authoritatively construed, satisfies *Miller's* requirement of "specificity." "In requiring that obscene matter must go 'substantially beyond contemporary limits of candor in description or representation of such matters,' the statute is substantially the same as the general *Miller* formulation which inquires 'whether the work depicts or describes, in a patently offensive way, sexual conduct.' *Miller* states that those matters must be 'specifically defined by the applicable state law.' Previous California cases have so limited section 311. Thus it is clear that section 311 prohibits only 'hardcore pornography' (*Zeitlin* v. *Arnebergh,* 59 Cal.2d 901 [31 Cal.Rptr. 800, 383 P.2d 152, 10 A.L.R.3d 707]), that nudity does not equate with obscenity and that 'no matter how ugly or repulsive the presentation, we are not to hold nudity, absent a sexual activity, to be obscene' (*People* v. *Noroff,* 67 Cal.2d 791 at p. 797 [63 Cal.Rptr. 575, 433 P.2d 479]), and that '[t]o constitute obscenity . . . the material must contain a graphic description of sexual activity' (*People* v. *Cimber,* 271 Cal.App.2d Supp. 867, 869 [76 Cal.Rptr. 382]). . . . *Miller,* thus has not imposed any new requirements upon California law insofar as [the first] two of the three elements required by section 311 are involved." (33 Cal.App.3d at pp. 908-910; fns. omitted.)

In *Miller,* the court vacated the judgment and remanded the case to the Appellate Department of the Orange County Superior Court for further proceedings "not inconsistent with the First Amendment standards established by this opinion." (413 U.S. at p. 37 [37 L.Ed.2d at p. 438].) Citing *Enskat,* the appellate department reaffirmed Miller's conviction for distributing obscene materials in violation of section 311.2, subdivision (a). The United States Supreme Court dismissed Miller's second appeal "for want of a substantial federal question." (418 U.S. 915 [41 L.Ed.2d 1158, 94 S.Ct. 3206] (*Miller II*).) Certiorari was denied in *Enskat.* (418 U.S. 937 [41 L.Ed.2d 1172, 94 S.Ct. 3225].)

Concluding it was not bound by *Miller II,* a three-judge federal district court declared section 311 et seq. unconstitutional under *Miller I.* (*Miranda* v. *Hicks* (C.D.Cal. 1974) 388 F.Supp. 350, revd., *Hicks* v. *Miranda* (1975) [422 U.S. 332, 45 L.Ed.2d 223, 95 S.Ct. 2281].) Citing *Bouie* v. *City of Columbia* (1964) 378 U.S. 347, 350-351 [12 L.Ed.2d 894, 897-898, 84 S.Ct. 1697], for the "established rule of Due Process that no person may be subject to criminal prosecution without 'fair notice that his contemplated conduct is forbidden by statute,' " the district court held: "(1) the California obscenity statute as written does not meet the specificity test of *Miller* and (2) the California courts, in interpreting the statute may have liberalized it beyond its wording but have not specifically construed it so as to give fair notice as to what is constitutionally prohibited." (*Miranda* v. *Hicks, supra,* 388 F.Supp. at pp. 356, 359, fn. omitted.)

The "fair notice" argument found persuasive in *Miranda* v. *Hicks* was rejected with regard to an equivalent federal obscenity statute in *Hamling* v. *United States.* "Nor do we find merit in petitioners' contention that cases such as *Bouie* v. *City of Columbia,* 378 U.S. 347 (1964), require reversal of their convictions. . . . [T]he enumeration of specific categories of material in *Miller* which might be found obscene did not purport to make criminal, for the purpose of 18 U.S.C. § 1461, conduct which had not previously been thought criminal. That requirement instead added a 'clarifying gloss' to the prior construction and· therefore made the meaning of the federal statute involved here 'more definite' in its application to federal obscenity prosecutions. *Bouie* v. *City of Columbia, supra,* at 353. Judged by both the judicial construction of § 1461 prior to *Miller, and by the construction of that section which we adopt today in the light of Miller,* petitioners' claims of vagueness and lack of fair notice as to the proscription of the material which they were distributing must fail." (418 U.S. at pp. 115-116 [41 L.Ed.2d at pp. 619-620]; italics added.)

Having failed to recognize the authority of *Miller II,* the three-judge court disregarded the plain significance of *Hamling.* (*Miranda* v. *Hicks, supra,* 388 F.Supp. at pp. 362-364.) Therefore, the United States Supreme Court was compelled to address itself to the constitutionality of section 311 once more. "[T]he District Court was in error in holding that it could disregard the decision in *Miller II.* That case was an appeal from a decision by a state court upholding a state statute against federal constitutional attack. A federal constitutional issue was properly presented, it was within our appellate jurisdiction under § 1257(2), and we had

no discretion to refuse adjudication of the case on its merits as would have been true had the case been brought here under our certiorari jurisdiction. We are not obligated to grant the case plenary consideration, and we did not; but we were required to deal with the merits. We did so by concluding that the appeal should be dismissed because the constitutional challenge to the California statute was not a substantial one. The three-judge court was not free to disregard this pronouncement." (*Hicks* v. *Miranda, supra,* 422 U.S. 332, 343-344 [45 L.Ed.2d 223, 236].)

Having previously denied hearing in *Enskat,* we now expressly approve that decision. Section 311 has been and is to be limited to patently offensive representations or descriptions of the specific "hard core" sexual conduct given as examples in *Miller I,* i.e., "ultimate sexual acts, normal or perverted, actual or simulated," and "masturbation, excretory functions, and lewd exhibitions of the genitals." (413 U.S. at p. 25 [37 L.Ed.2d at p. 431].) As so construed, the statute is not unconstitutionally vague.

Assuming arguendo that section 311 as authoritatively construed is as "specific" as *Miller I* requires, plaintiff contends the statute is, nevertheless, so vague as to deny him due process of law. Plaintiff argues that judging a work's "prurient interest" or "social value" is so subjective a process that its outcome is inherently unpredictable, denying a potential violator fair notice of what is prohibited. Rejecting this argument, the United States Supreme Court has repeatedly upheld obscenity legislation against attacks mounted under the due process clause of the federal Constitution. (*Hamling* v. *United States, supra,* 418 U.S. 87, 89 [41 L.Ed.2d 590, 604]; *Miller* v. *California, supra,* 413 U.S. 15, 27-28 [37 L.Ed.2d 419, 432-433]; *Roth* v. *United States, supra;* 354 U.S. 476, 491-492 [1 L.Ed.2d 1498, 1510-1511].) The due process clause of the California Constitution does not impose a stricter standard in this regard.

Plaintiff's contention that the right to possess obscene material in the privacy of one's own home, announced in *Stanley* v. *Georgia* (1969) 394 U.S. 557 [22 L.Ed.2d 542, 89 S.Ct. 1243], implies the right not only to receive, but also to sell and distribute such material, has been completely discredited. "The District Court ignored both *Roth* and the express limitations on the reach of the *Stanley* decision. Relying on the statement in *Stanley* that 'the Constitution protects the right to receive information and ideas . . . regardless of their social worth,' 394 U.S., at 564, the trial judge reasoned that 'if a person has the right to receive and possess this

material, then someone must have the right to deliver it to him.' . . . [¶] The District Court gave *Stanley* too wide a sweep. To extrapolate from Stanley's right to have and peruse obscene material in the privacy of his own home a First Amendment right in Reidel to sell it to him would effectively scuttle *Roth*, the precise result that the *Stanley* opinion abjured. Whatever the scope of the 'right to receive' referred to in *Stanley*, it is not so broad as to immunize the dealings in obscenity in which Reidel engaged here [distributing it by mail]—dealings that *Roth* held unprotected by the First Amendment." (*United States* v. *Reidel* (1971) 402 U.S. 351, 355 [28 L.Ed.2d 813, 817, 91 S.Ct. 1410]; see *Paris Adult Theatre I* v. *Slaton* (1973) 413 U.S. 49, 69 [37 L.Ed.2d 446, 464, 93 S.Ct. 2628]; *United States* v. *Thirty-Seven Photographs* (1971) 402 U.S. 363, 375-377 [28 L.Ed.2d 822, 833-835, 91 S.Ct. 1400]; *People* v. *Luros* (1971) 4 Cal.3d 84, 90-93 [92 Cal.Rptr. 833, 480 P.2d 633].)

■ Plaintiff next contends that section 311.2, subdivision (a), should be declared invalid under article I, sections 1 and 2, of the California Constitution on the ground that the state has no legitimate interest in regulating commercial distribution of obscene material. This contention, too, has been thoroughly discredited. "[W]e hold that there are legitimate state interests at stake in stemming the tide of commercialized obscenity, even assuming it is feasible to enforce effective safeguards against exposure to juveniles and to passersby. [Fn. omitted.] Rights and interests 'other than those of the advocates are involved.' [Citation omitted.] These include the interest of the public in the quality of life and the total community environment, the tone of commerce in the great city centers, and, possibly, the public safety itself. The Hill-Link Minority Report of the Commission on Obscenity and Pornography indicates that there is at least an arguable correlation between obscene material and crime. [Fn. omitted.] . . . . [¶] But, it is argued, there are no scientific data which conclusively demonstrate that exposure to obscene material adversely affects men and women or their society. It is urged on behalf of the petitioners that, absent such a demonstration, any kind of state regulation is 'impermissible.' We reject this argument. . . . [¶] . . . . [¶] . . . . [¶] If we accept the unprovable assumption that a complete education requires the reading of certain books [citation omitted], and the well nigh universal belief that good books, plays, and art lift the spirit, improve the mind, enrich the human personality, and develop character, can we then say that a state legislature may not act on the corollary assumption that commerce in obscene books, or public exhibitions focused on obscene conduct, have a tendency to exert a corrupting and debasing impact leading to antisocial behavior? . . . The

sum of experience, including that of the past two decades, affords an ample basis for legislatures to conclude that a sensitive, key relationship of human existence, central to family life, community welfare, and the development of human personality, can be debased and distorted by crass commercial exploitation of sex. Nothing in the Constitution prohibits a State from reaching such a conclusion and acting on it legislatively simply because there is no conclusive evidence or empirical data." (*Paris Adult Theatre I* v. *Slaton, supra,* 413 U.S. at pp. 57-63 [37 L.Ed.2d at pp. 456-460].)

Finally, plaintiff makes the unorthodox argument that section 311.2, subdivision (a), should be declared unconstitutional on the ground that society's limited resources can be better spent on problems other than obscenity. The appropriate answer to this argument was given in *United States* v. *Reidel, supra,* 402 U.S. 351. "It is urged that there is developing sentiment that adults should have complete freedom to produce, deal in, possess, and consume whatever communicative materials may appeal to them and that the law's involvement with obscenity should be limited to those situations where children are involved or where it is necessary to prevent imposition on unwilling recipients of whatever age. The concepts involved are said to be so elusive and the laws so inherently unenforceable without extravagant expenditures of time and effort by enforcement officers and the courts that basic reassessment is not only wise but essential. This may prove to be the desirable and eventual legislative course. But if it is, the task of restructuring the obscenity laws lies with those who pass, repeal, and amend statutes and ordinances." (402 U.S. at p. 357 [28 L.Ed.2d at p. 818].)

The remainder of plaintiff's contentions do not merit extended discussion. Federal statutes do not preempt state prosecution of distribution of obscene matter through the mails. (*Miller* v. *California, supra,* 413 U.S. at pp. 17-18, fn. 1 [37 L.Ed.2d at pp. 426-427].) Distribution and exhibition of obscene matter may be charged in a single count under section 311.2, subdivision (a). (*People* v. *McClennegen* (1925) 195 Cal. 445, 452 [234 P. 91]; *People* v. *Horiuchi* (1931) 114 Cal.App. 415, 427 [300 P. 457].)

The judgment is affirmed.

McComb, J., Sullivan, J., and Burke, J.,* concurred.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

**WRIGHT, C. J.**—I concur in the opinion of the majority with some reluctance and with a considerable feeling of futility. I concur for the reason that I believe our statutory definition of obscenity (Pen. Code, § 311) meets the requirements spelled out by the majority of the members of the Supreme Court in *Miller* v. *California* (1973) 413 U.S. 15 [37 L.Ed.2d 419, 93 S.Ct. 2607] and especially as fortified by the majority opinion in *Paris Adult Theatre I* v. *Slaton* (1973) 413 U.S. 49 [37 L.Ed.2d 446, 93 S.Ct. 2628] decided the same day as *Miller*. As of this day those opinions represent the law of this land.

Although I do not hesitate in appropriate cases to rely exclusively upon the provisions of our own state Constitution and have done so on many occasions, I am unwilling to follow the route taken by the dissenters in the case now before us. We are not, for example, confronted with the type of situation which occurred when a majority of the United States Supreme Court came down with their decisions in *United States* v. *Robinson* (1973) 414 U.S. 218 [38 L.Ed.2d 427, 94 S.Ct. 467] and *Gustafson* v. *Florida* (1973) 414 U.S. 260 [38 L.Ed.2d 456, 94 S.Ct. 488]. We were obliged to make a decision forthwith whether every citizen subjected to a custodial arrest for a traffic offense, however minor, could be subjected to a complete body search at the scene of the stop. This was in direct opposition to the position taken by a majority of our court on numerous occasions. (See *People* v. *Superior Court (Kiefer)* (1970) 3 Cal.3d 807 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559]; *People* v. *Superior Court (Simon)* (1972) 7 Cal.3d 186 [101 Cal.Rptr. 837, 496 P.2d 1205].) We were required either to rely upon our own Constitution or permit the citizens of our state to be subjected to searches which we had long held were violative of constitutional rights guaranteed to them. I had no hesitation as to which way our course lay and joined the majority in *People* v. *Brisendine* (1975) 13 Cal.3d 528 [119 Cal.Rptr. 315, 531 P.2d 1099] (see also *People* v. *Norman* (1975) 14 Cal.3d 929 [123 Cal.Rptr. 109, 538 P.2d 237]) relying upon our state Constitution to afford the people of our state the right to be free of searches such as those approved in *Robinson* and *Gustafson*. It was essential that we act at the first possible moment when we were presented with a case which embraced the essential issue of the two federal cases.

No similar demand for an immediate solution is present in the case now before us and I do not see that haste is indicated. The whole subject of what is and what is not pornographic is a slowly evolving, always eroding, ever changing concept, laced as it is with a continuing concern with First Amendment protections in conflict with the current moral, ethical, philosophical, religious, and sexual beliefs and practices of our

citizens. We are all aware that attitudes change from time to time and what was considered as pornographic a few short years ago is now acceptable to a large majority of our people.

A few examples which have occurred during my not overly long life are indicative of the changes I mentioned. Throughout my academic and college days a woman's committee of three selected from a civic organization sat as a board of censors and determined by majority vote what motion pictures could be shown to the people of Pasadena, and the committee alone (there was no provision for an appeal from their decision) was free to ban or censor any film or delete therefrom all segments which might be offensive to a majority of the members of that committee and, in their judgment, to the residents of Pasadena.

As a law student it was necessary to travel to Quincy, Massachusetts, to view a stage production of Eugene O'Neill's "Strange Interlude," one of his more soporific plays, because a well meaning self-appointed group bearing the appropriate sobriquet, "The Watch and Ward Society," determined that the Nobel and Pulitzer prize author's offering was offensive to the good people of the Boston area. We are all acquainted with the trials and tribulations of James Joyce's masterpiece, "Ulysses" (also soporific) before an individual was legally permitted to peruse it. There are a myriad of other examples I could mention.

But all of the "protections" I have described have fortunately disappeared and eventually, I believe so will the indefinite and vague "safety precautions" of *Miller* come to a similar fate. Perhaps what will evolve will be the adoption of the position advocated by Mr. Justice Brennan in his illuminating dissenting opinion in *Paris Adult Theatre I*. He wrote: "In short, while I cannot say that the interests of the State—apart from the question of juveniles and unconsenting adults —are trivial or nonexistent, I am compelled to conclude that these interests cannot justify the substantial damage to constitutional rights and to this Nation's judicial machinery that inevitably results from state efforts to bar the distribution even of unprotected material to consenting adults. [Citations.] I would hold, therefore, that at least in the absence of distribution to juveniles or obtrusive exposure to unconsenting adults, the First and Fourteenth Amendments prohibit the State and Federal Governments from attempting wholly to suppress sexually oriented materials on the basis of their allegedly 'obscene' contents." (*Id.,* at pp. 112-113 [37 L.Ed.2d at p. 490].)The adoption of such a standard might

well lead the way to a constitutional interpretation that will be free of the vagueness that haunts *Miller* and might well be enforceable.

The dissenters in the case at bench adopt the same approach in part but have extended to some degree the holding of *Stanley* v. *Georgia* (1969) 394 U.S. 557 [22 L.Ed.2d 542, 89 S.Ct. 1243].

**TOBRINER, J.**—I dissent. The majority today attempt to save the California obscenity statute (Pen. Code, § 311.2) through incorporating by reference the general guidelines set forth in *Miller* v. *California* (1973) 413 U.S. 15 [37 L.Ed.2d 419, 93 S.Ct. 2607]. This effort is unlikely to prove any more successful in resolving the "intractable obscenity problem" (*Interstate Circuit* v. *Dallas* (1968) 390 U.S. 676, 704 [20 L.Ed.2d 225, 243, 88 S.Ct. 1298] (Harlan, J. concurring and dissenting), than was *Roth* v. *United States* (1957) 354 U.S. 476 [1 L.Ed.2d 1498, 77 S.Ct. 1304] and its progeny. The adopted approach fails to remedy either the inherent vagueness of the obscenity concept, or the unwarranted interference of such regulation with the individual's fundamental right to speak, to read and to view freely, subject only to constitutional limitation. As I do not believe that either of these deficiencies can be corrected in the context of a statute prohibiting the communication of "obscenity" to consenting adults, I would hold Penal Code section 311.2 invalid under the California Constitution.

The somewhat tortured history of judicial attempts to define obscenity has been fully reviewed elsewhere,[1] and requires no repetition here. Suffice it to say that the extraordinary difficulty of pronouncing intelligible standards capable of providing notice to the public and guidelines to the judiciary by which to distinguish between protected and unprotected speech has been recognized by courts and commentators alike.[2]

---

[1] See *Miller* v. *California, supra,* 413 U.S. 15, 20 [37 L.Ed.2d 419, 428]: *Paris Adult Theater I* v. *Slaton* (1973) 413 U.S. 49, 73 [37 L.Ed.2d 446, 466-467, 93 S.Ct. 2628] (Brennan, J., dissenting); *Interstate Circuit* v. *Dallas, supra,* 390 U.S. 676, 704 [20 L.Ed.2d 225, 243] (Harlan, J. concurring and dissenting).

[2] The majority in *Miller* v. *California, supra,* 413 U.S. 15, 22 [37 L.Ed.2d 419, 429] noted that "[a]part from the initial formulation in the *Roth* case, no majority of the Court has at any given time been able to agree on a standard to determine what constitutes obscene, pornographic material subject to regulation under the States' police power. See, *e.g., Redrup* v. *New York,* 386 U.S., at 770-771. We have seen 'a variety of views among the members of the Court unmatched in any other course of constitutional adjudication.' *Interstate Circuit, Inc.* v. *Dallas,* 390 U.S., at 704-705 (Harlan, J. concurring and dissenting) (footnote omitted)." (Fn. omitted.) (See Note. *The First Amendment Overbreadth Doctrine* (1970) 83 Harv.L.Rev. 844, at pp. 883-890: Note. *New Prosecutorial*

Following repeated failure to develop an adequate standard, essentially two views have coalesced: one maintains that the traditional approach will suffice provided that the standard is "fine tuned" to limit the scope of liability and specify the acts whose depiction will render a work obscene; the other recognizes that the vagueness and uncertainty in the obscenity area stems primarily not from disagreement as to the permissible scope of regulation, or lack of an agreed verbal formulation, but rather from the inherent subjectivity that attaches to regulation of this nature.[3] *Miller* exemplifies the former approach; I have concluded that the latter is the only path consistent with established constitutional principles.

The most basic of these principles is embodied in the rule that "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." (*Lanzetta* v. *New Jersey* (1939) 306 U.S. 451, 453 [83 L.Ed. 888, 890, 59 S.Ct. 618].) Recognizing that a civilized society does not imprison a person for violating prohibitions on conduct that cannot even be defined, this court has repeatedly stated that "[t]he requirement of a reasonable degree of certainty in legislation, especially in the criminal law, is a well established element of the guarantee of due process of law." (*In re Newbern* (1960) 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116].) At a minimum, therefore, any proposed obscenity standard must meet the test that it is not so vague "that men of common intelligence must necessarily guess at its meaning and differ as to its application. . . ." (*Connally* v. *General Construction Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126].)

The requirement of fair notice is rooted not only in the federal Constitution, but also in the due process clause of the California Constitution. (Art. I, § 7.) We have had several occasions to note that our state Constitution is a document of independent force and significance.[4] Indeed, the California Constitution expressly so provides: "Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution." (Art. I, § 24.) It is therefore the duty of this court to exercise independent judgment as to the validity of obscenity legislation in the light of constitutional principles.

---

*Techniques and Continued Judicial Vagueness: An Argument for Abandoning Obscenity as a Legal Concept* (1973) 21 U.C.L.A. L.Rev. 181.)

[3] Compare *Miller* v. *California, supra,* 413 U.S. 15 with *Paris Adult Theater I* v. *Slaton, supra,* 413 U.S. 49, 73 [37 L.Ed.2d 446, 466-467] (Brennan, J. dissenting).

[4] See, e.g., *People* v. *Brisendine* (1975) 13 Cal.3d 528, 549 [119 Cal.Rptr. 315, 531 P.2d 1099]; *Curry* v. *Superior Court* (1970) 2 Cal.3d 707, 716 [87 Cal.Rptr. 361, 470 P.2d 345].

I am convinced that no formulation of an obscenity standard aimed at consenting adults can provide adequate notice to potential violators as to what conduct is permissible and what will later be deemed criminal. This conclusion rests not merely upon the fact that years of effort to develop a predictable rule has led only to "utter bewilderment" (*Interstate Circuit v. Dallas, supra,* 390 U.S. at p. 707 [20 L.Ed.2d at p. 245] (Harlan, J. concurring and dissenting)), but more importantly upon the realization that the very characteristics of the obscenity concept are inherently subjective, and cannot be communicated in a rule of predictable application. These factors, in my view, point inescapably towards the conclusion that the type of regulation attempted by Penal Code section 311.2 is unsuitable for the composition of criminal penalties.

The subjectivity that is unavoidable in formulating legal standards that define obscenity stems initially from the fact that the First Amendment protects any work which communicates significant ideas, including those which pertain to sex. A rule merely prohibiting the depiction of certain specifically defined acts is thereby foreclosed. "We could hold, for example, that any depiction or description of human sexual organs, irrespective of the manner or purpose of the portrayal, is . . . open to suppression by the States. . . . But such a standard would be appallingly overbroad, permitting the suppression of a vast range of literary, scientific and artistic masterpieces. Neither the First Amendment nor any free community could possibly tolerate such a standard." (*Paris Adult Theater I v. Slaton, supra,* 413 U.S. 49, 94 [37 L.Ed.2d 446, 479] (Brennan, J. dissenting).) Thus every court since *Roth* has adhered to the fundamental view that, in order to be held obscene, a work must lack a significant quantum of social value.[5]

Even if we assume the viability of the social value test, its application requires that the jury in each case pass upon the intellectual content and

---

[5] In *Roth* v. *United States, supra,* 354 U.S. 476 the court stated that. "[a]ll ideas having even the slightest redeeming social importance—unorthodox ideas. controversial ideas. even ideas hateful to the prevailing climate of opinion—have the full protection of the [First Amendment] guarantees. unless excludable because they encroach upon the limited area of more important interests." (354 U.S. 476. at 484 [1 L.Ed.2d 1498. at p. 1507] (fn. omitted).) This statement was interpreted by the court in *Memoirs* v. *Massachusetts* (1966) 383 U.S. 413. 419 [16 L.Ed.2d 1. 6. 86 S.Ct. 975] to require the jury to find the challenged material to be "utterly without redeeming social value." Most justices adopted some variant of the "social value" test in formulating their individual standards for identifying obscenity. (See *Redrup* v. *New York* (1967) 386 U.S. 767. 770 [18 L.Ed.2d 515. 517-518. 87 S.Ct. 1414].) *Miller* revised the *Memoirs* test to require a showing of "serious" literary. artistic. political. or scientific value. (*Miller* v. *California, supra,* 413 U.S. at p. 24 [37 L.Ed.2d at p. 431].)

social utility of the challenged work. We need not elaborate upon the utterly subjective and unpredictable nature of such an undertaking. In truth this standard demands of the jury an evaluation of whether, despite its sexually explicit nature, a work is sufficiently important to merit public dissemination. This issue does not turn upon fact, but upon judgment—which necessarily derives from personal taste, values, and experience. That individuals consistently reach different judgments in appraising a given work on this basis can hardly come as a surprise.[6] Yet the Penal Code requires the defendant, at peril of liberty, to guess whether a particular jury will hold that his work is obscene under this diffuse standard.

The problem of vagueness is aggravated still further by the fact that the jury is called upon to determine and apply a *"community"* standard in some phases of its deliberations. This delegation of judgment contrasts sharply with virtually the entire corpus of the criminal law, in which the community's view of appropriate conduct is embodied in the rule itself.[7] Here, however, the jury is expected *both* to determine the applicable standard and to judge whether the defendant's conduct conforms to it. "By its terms the statute leaves to the individual judge or jury the determination of the meaning of the law as well as what proven facts render the accused guilty or innocent. It is not difficult to visualize the divergence of decisions or verdicts that must ensue when the law leaves its definition and meaning to be determined by judges and juries who might differ widely in regard to it." (*In re Newbern, supra,* 53 Cal.2d, at p. 796.)

Clearly the validity of conditioning criminal liability upon the accurate prediction of a "community" standard not specified by statute heavily relies upon the presence of a highly cohesive community view which is both predictable in application, and readily apparent to the average person. Yet findings contained in the Commission Report cast serious doubt upon the very concept of a "community standard," let

[6] See, for example, the record of Supreme Court per curiam reversals of obscenity determinations following *Roth* and *Redrup*, listed in the Report of the United States President's Commission on Obscenity and Pornography (Sept. 1970) (hereafter cited as Commission Report) at page 318. Although the jury in virtually each such case presumably found beyond a reasonable doubt that the material at issue was "utterly without redeeming social value," the court—exercising its independent judgment—disagreed.

[7] All penal statutes are, of course, statements of conduct that the community finds offensive. Yet uniquely with respect to obscenity, the statute does not identify the offensive conduct, but rather makes reference to a community standard that is applied by the jury to the defendant's conduct after the allegedly offensive act has already occurred.

alone the existence of one capable of providing fair notice of what is prohibited: ". . . people do not agree about whether or not a given sexual stimulus is 'sexually arousing,' 'offensive' or 'pornographic'. . . . In nearly every case the judgments provided by a group for a given stimulus ranged from one extreme to another. For example . . . [the subjects in one test] so differed among themselves in their judgments of this picture on each of these dimensions that their judgments were distributed on each of the 11 points of the scale. . . . Similar findings, regarding the lack of consensus among members of the groups in their judgments of explicit sexual stimuli along dimensions related to constitutional standards for obscenity were found by other investigators using a variety of kinds of subject and stimuli." (Commission Report, *supra,* at pp. 355-356.)

These findings confirm the lesson of nearly two decades of experience with obscenity regulation—that there is no representative "community view," but rather a spectrum of response to identical material *within* a community. To delegate to the jury the determination of a hypothetical community standard is thus necessarily to deprive the defendant of advance warning of what is prohibited. Although a state "community standard" is more realistic than a national standard, it falls far short of providing the level of certainty required of a criminal statute.

While failure to provide fair notice of what is prohibited would, of course, be independently sufficient to invalidate Penal Code section 311.2 on due process grounds, we tread here, of course, on territory at least closely bordered by the First Amendment. "While the basic standard against which statutes must be measured for vagueness is a constant, the vigor with which that standard is applied varies with the determination whether a constitutionally protected right is involved." (*People* v. *Barksdale* (1972) 8 Cal.3d 320, at p. 327 [105 Cal.Rptr. 1, 503 P.2d 257].) ". . . [S]tandards of permissible statutory vagueness are strict in the area of free expression" (*N. A. A. C. P.* v. *Button* (1963) 371 U.S. 415, at p. 432 [9 L.Ed.2d 405, at p. 417, 83 S.Ct. 328]) for "[w]here regulations of the liberty of free discussion are concerned, there are special reasons for observing the rule that it is the statute, not the accusation or the evidence under it, which prescribes the limits of permissible conduct and warns against transgression." (*Thornhill* v. *Alabama* (1940) 310 U.S. 88, at p. 98 [84 L.Ed. 1093, at p. 1100, 60 S.Ct. 736].)

Vague standards at the perimeter of the First Amendment give rise to twin dangers: ambiguity leads to applications of the statute directly

suppressing protected speech; and fear of prosecution—regardless of outcome—casts a chilling effect on expression, causing the wary to " 'steer far wider of the unlawful zone.' " (*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 279 [11 L.Ed.2d 686, 706, 84 S.Ct. 710, 95 A.L.R.2d 1412].)[8] In the obscenity area these dangers are not merely theoretical. The Commission on Obscenity and Pornography, following the study of the effects of the *Roth-Memoirs* standard, were led to the alarming conclusion that ". . . in some communities constitutionally protected material may simply not be available because of the dangers of attempting to engage in distribution of sexually explicit works" (Commission Report, *supra,* at p. 359). Obscenity prosecution in the post-*Miller* era has led one judge to remark that, "[M]y experience with this one case teaches me that the 'alarm of repression' was validly sounded; it also teaches me that the *Miller* majority's assumption that courts can distinguish commerce in ideas that is protected from commercial exploitation of obscene material that is not protected is a too optimistic assumption." (*Jenkins* v. *State* (1973) 230 Ga. 726 [199 S.E.2d 183, 188] revd. sub. nom. *Jenkins* v. *Georgia* (1974) 418 U.S. 153 [41 L.Ed.2d 642, 94 S.Ct. 2750].) (Gunter, J. dissenting.)

Although no definition of obscenity calculated to curtail the flow of material to consenting adults may be framed within the permissible scope of the vagueness doctrine, the state can nevertheless properly protect the unwilling adult from offensive assaults on his sensibilities and shield its children from sexually explicit material. In these areas, as will be shown below, the permissible scope of regulation under the First Amendment is wider and greater. Consequently, far more strict explicit statutory standards may be employed, alleviating the problems of notice and overbroad application.

The notion that the state pursues a legitimate interest in protecting the privacy of those who may be subjected to unwanted and offensive displays of sexually explicit material now finds endorsement by those on all sides of the obscenity debate.[9] Having evolved gradually over the past 16 years, this concept has been articulated into a rule which recognizes the propriety of state regulation over the manner of public distribution of

---

[8]See *N. A. A. C. P.* v. *Button, supra,* 371 U.S. 415 at p. 433 [9 L.Ed.2d 405, at p. 418]; Note, *The Void-for-Vagueness Doctrine in the Supreme Court* (1960) 109 U.Pa.L.Rev. 67 at pp. 76, 80.

[9]See *Miller* v. *California, supra,* at pages 18-19 [37 L.Ed.2d at pp. 427-428]; *Miller* at page 44 [37 L.Ed.2d at pp. 442-443] (Douglas, J. dissenting); *Paris Adult Theater I* v. *Slaton, supra,* at pages 105-107 [37 L.Ed.2d at pp. 485-487] (Brennan, J. dissenting).

even constitutionally protected material for the purpose of protecting a "captive audience."[10] Justice Stewart, concurring in *Ginsberg* v. *New York* (1968) 390 U.S. 629, 649 [20 L.Ed.2d 195, 209, 88 S.Ct. 1274], explained that "[w]hen expression occurs in a setting where the capacity to make a choice is absent, government regulation of that expression may co-exist with and even implement First Amendment guarantees. So it is that this court sustained a city ordinance prohibiting people from imposing their opinions on others 'by way of sound trucks with loud and raucous noises on city streets' [*Kovacs* v. *Cooper,* 336 U.S. 77, 86 (93 L.Ed. 513, 521-522, 69 S.Ct. 448, 10 A.L.R.2d 608)]. And so it was that my Brothers Black and Douglas thought that the First Amendment itself prohibits a person from foisting his uninvited view upon the members of a captive audience [*Public Utilities Comm'n* v. *Pollak,* 343 U.S. 451, 466 (96 L.Ed. 1068, 1079, 72 S.Ct. 813) (Black, J. dissenting), 467 (96 L.Ed. 1079-1080) (Douglas, J. dissenting)]."

A broader scope of permissible state regulation has similarly been recognized for the protection of children from obscenity. Thus, in *Ginsberg* the court upheld the constitutionality of a special statute directed at the sale of "obscene" material to minors. The court concluded that the state could constitutionally prohibit the dissemination of certain material to minors, even though a general prohibition on such dissemination would have violated the First Amendment. Quoting with approval from *Bookcase, Inc.* v. *Broderick* (1966) 18 N.Y.2d 71, [218 N.E.2d 668, 671], the court noted that "[m]aterial which is protected for distribution to adults is not necessarily constitutionally protected from restriction upon its dissemination to children. In other words, the concept of obscenity or of unprotected matter may vary according to the group to whom the questionable material is directed or from whom it is quarantined." (390 U.S., at p. 636 [20 L.Ed.2d at p. 202].)

In the interest of protecting minors as well as unconsenting adults, therefore, it is permissible to define for regulation material that in other contexts would be deemed insulated by the First Amendment. The definition of obscenity for these purposes need not incorporate the subjective "social value" and "community standard" tests, which are designed to distinguish between protected and unprotected speech. By focusing directly upon the characteristics of the material offensive to unwilling adults and inappropriate for children, the state could permissibly define obscenity for these groups in specific terms to prohibit the

---

[10]See *People* v. *Luros* (1971) 4 Cal.3d 84, 101, footnote 13 [92 Cal.Rptr. 833, 480 P.2d 633] (Tobriner, J. dissenting).

description or depiction of particular sexual acts. Such narrowly drawn statutes would not be subject to the due process and First Amendment objections applicable to Penal Code section 311.2.

By merely copying *Miller,* the court today only postpones the difficult though inevitable task of formulating new standards that are consistent with fundamental constitutional principles. It does so in the face of a rising tide of opinion that *Miller* is "probably transient" (*Commonwealth* v. *Horton* (Mass. 1974) 310 N.E.2d 316, 325 (Kaplan, J. concurring)), and must ultimately yield to the conclusion that, ". . . no one definition, no matter how precisely or narrowly drawn, can possibly suffice for all situations, or carve out fully suppressible expression from all media without also creating a substantial risk of encroachment upon the guarantees of the Due Process Clause and the First Amendment" (*Paris Adult Theater I* v. *Slaton, supra,* 413 U.S., at p. 85 [37 L.Ed.2d at p. 474] (Brennan, J. dissenting)). This view now commands the support of four members of the United States Supreme Court (see *Paris Adult Theater I* v. *Slaton, supra,* at p. 70 [37 L.Ed.2d at p. 465] (Douglas, J. dissenting) and p. 73 [37 L.Ed.2d at pp. 466-467] (Brennan, J. dissenting)), an increasing number of state court judges,[11] and even more widespread acceptance among commentators.[12] In my opinion, we should now recognize that Penal Code section 311.2 is void for vagueness.

Even apart from vagueness, Penal Code section 311.2 must be invalidated on other constitutional grounds. By seeking to suppress the consenting adult's access to "obscene" material, the state intrudes upon the individual's fundamental right to receive information and ideas. This intrusion is not supported, in my view, by any compelling state interest.

The foremost articulation of the right to receive information and ideas appears in *Stanley* v. *Georgia* (1969) 394 U.S. 557 [22 L.Ed.2d 542, 89 S.Ct. 1243], which held that the state could not permissibly prohibit the

[11]See *Jenkins* v. *State, supra,* 199 S.E.2d 183, 185 (Gunter, J. dissenting); *Commonwealth* v. *Horton, supra,* 310 N.E.2d 316 (Kaplan, J. concurring); *State* ex rel. *Wampler* v. *Bird* (Mo. 1973) 499 S.W.2d 780 (Seller, J. dissenting); *People* v. *Heller* (1973) 33 N.Y.2d 314 [352 N.Y.S.2d 601, 307 N.E.2d 805] (Wachtler, J. dissenting).

[12]See, e.g., Note, *New Prosecutorial Techniques and Continued Judicial Vagueness: An Argument for Abandoning Obscenity as a Legal Concept* (1973) 21 U.C.L.A. L.Rev. 181; Note, *In Quest of a "Decent Society": Obscenity and the Burger Court* (1973) 49 Wash.L.Rev. 89; Wolf, *Obscenity: The Lingering Uncertainty* (1972) N.Y.U.Rev. L. & Soc. Change; Hunsaker, *The 1973 Obscenity-Pornography Decisions: Analysis, Impact, and Legislative Alternatives* (1974) 11 San Diego L.Rev. 906; Note, *Obscenity '73: Something Old, A Little Bit New, Quite a Bit Borrowed, But Nothing Blue* (1973) 33 Md.L.Rev. 421.

private possession of obscene material for personal use. Although the far-reaching implications of *Stanley* have been largely repudiated in subsequent decisions of the United States Supreme Court,[13] I believe that the constitutional rationale underlying *Stanley* suggests the fundamental principles that properly guide analysis of obscenity regulation. The logic of these principles compels the invalidation of Penal Code section 311.2.

Synthesizing a line of cases spanning the last half-century, the *Stanley* court unequivocally identified a fundamental interest in the individual as a recipient of ideas: "It is now well established that the Constitution protects the right to receive information and ideas. 'This freedom [of speech and press] . . . necessarily protects the right to receive. . . .' *Martin v. City of Struthers*, 319 U.S. 141 (1943); see *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965); *Lamont v. Postmaster General*, 381 U.S. 301, 307-308 (1965) (Brennan, J. concurring); cf. *Pierce v. Society of Sisters* 268 U.S. 510 (1925). This right to receive information and ideas, regardless of their social worth, see *Winters v. New York*, 333 U.S. 507, 510 (1948), is fundamental to our free society." (*Stanley v. Georgia, supra,* 394 U.S. 557, 564 [22 L.Ed.2d 542, 549].)

*Stanley* makes clear that the "right to receive" is not subordinated simply by the fact that the material at issue is "obscene." ". . . [M]ere categorization of these films as 'obscene' is insufficient justification for such a drastic invasion of personal liberties guaranteed by the First and Fourteenth Amendments." (*Stanley v. Georgia, supra,* 394 U.S., at p. 565 [22 L.Ed.2d at p. 549].) Rather, under *Stanley,* the state's interest in regulating obscenity is to be balanced against the intrusion of such regulation upon the fundamental rights of the individual: "*Roth* and its progeny certainly do mean that the First and Fourteenth Amendments recognize a valid governmental interest in dealing with the problem of obscenity. But the assertion of that interest cannot, in every context, be insulated from all constitutional protections." (*Id.,* at p. 563 [22 L.Ed.2d at p. 548].) Balancing the competing interests before it, the court in *Stanley* found the state's interest in suppressing obscenity to be insufficiently compelling to outweigh the individual's right to private possession of obscene material.

Although *Stanley* recognized that *Roth* and the cases following it discerned a subordinating interest in the regulation of commercial

---

[13] See *United States v. Reidel,* (1971) 402 U.S. 351 [28 L.Ed.2d 813, 91 S.Ct. 1410]; *United States v. Thirty-Seven Photographs* (1971) 402 U.S. 363 [28 L.Ed.2d 822, 91 S.Ct. 1400]; *Paris Adult Theater I v. Slaton, supra,* 413 U.S. 49.

distribution of obscene material, it is for this court to weigh independently the asserted governmental interests in censorship against the fundamental rights protected by the California Constitution.[14] I have concluded that Penal Code section 311.2 is unsupported by any subordinating state interest insofar as it attempts to keep assertedly obscene material from consenting adults.[15]

The fundamental right to receive information and ideas "regardless of their social worth" is predicated upon the notion that in a free society, the worth of an idea or form of expression is measured not by the willingness of the state to tolerate it, but rather by the willingness of the individual to receive it. "The constitutional right of free expression . . . is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests. . . . To many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve. . . . That is why '[w]holly neutral futilities . . . come under the protection of free speech as fully as do Keats' poems or Donne's sermons,' *Winters* v. *New York* 333 U.S. 507, 528 (1948) (Frankfurter, J. dissenting), and why 'so long as the means are peaceful, the communication need not meet standards of acceptability.' *Organization for a Better Austin* v. *Keefe,* 402 U.S. 415, 419 (1971)." (*Cohen* v. *California* (1971) 403 U.S. 15, at pp. 24-25 [29 L.Ed.2d 284, at pp. 293-294].)

Moreover, the "inherent dangers of undertaking to regulate any form of expression" (*Miller* v. *California, supra,* 413 U.S., at p. 23 [37 L.Ed.2d at p. 430]) cautions against the casual suppression of any material,

---

[14]See footnote 4 and accompanying text: California Constitution, article I, sections 1 and 2.

[15]I have previously had occasion to suggest that constitutional protection for some forms of public distribution of obscenity may be directly implied from the right to possess privately obscene material in the home (see *People* v. *Luros, supra,* 4 Cal.3d 84, 93 (Tobriner, J. dissenting). The present analysis focuses on constitutional limitations on obscenity regulation under the broader right to receive information and ideas. Under either of these principles, in my opinion, Penal Code section 311.2 may be invalidated on its face as constitutionally overbroad. (See, e.g., *N. A. A. C. P.* v. *Button, supra,* 371 U.S. 415, 432 [9 L.Ed.2d 405, 417-418].)

regardless of its deemed social value. Government censorship, though aimed at the elimination of "obscenity," inevitably threatens to curtail a measure of political expression as well.[16] This danger becomes aggravated in light of the vagueness and related ills that naturally attend this type of regulation. This possibility necessitates not only that the scope of the content of suppressible material be narrowly circumscribed, but also that a state interest of more substantial proportions be shown before attempting such suppression at all.

In the absence of a powerful governmental purpose, therefore, the First Amendment, in my view, prohibits the state from barring from those who consent to receive it any designated category of communication. To intrude upon the individual's fundamental right to obtain information the statute must be premised on more than a mere rational relation to a permissible state purpose; the proffered regulation must be necessary to the effectuation of a compelling state interest. (*City of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259, 268 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313].) Only if it meets this test may Penal Code section 311.2 be sustained.

Three state interests are generally proffered to support governmental suppression of the acquisition of obscenity by consenting adults: (1) prevention of anti-social behavior assertedly caused by viewing such material; (2) protection of the individual's morality by restricting his access to it; and (3) preservation of the quality of life and community environment by eradicating public sanction of obscenity. *Stanley* explicitly rejected as incompatible with the First Amendment the first two of these purported state interests; I believe the third is equally inadequate to sustain an invasion of fundamental rights.

The notion that the state can proffer a compelling interest in obscenity regulation upon the theory that viewing obscenity leads to criminal behavior was dismissed by the *Stanley* court as both empirically baseless and constitutionally infirm. Noting that there is little scientific evidence to support the assertion that exposure to obscenity leads to deviant or criminal sexual behavior,[17] the court observed that, "[g]iven the present state of knowledge, the state may no more prohibit mere possession of obscene matter on the ground that it may lead to antisocial conduct than it may prohibit possession of chemistry books on the ground that they

---

[16] See *People* v. *Luros, supra,* 4 Cal.3d 84, 96 (fn. 4), page 98 (fn. 7) (Tobriner, J. dissenting).

[17] This view was confirmed by the Commission Report, *supra,* page 27.

may lead to the manufacture of home-made spirits." (*Stanley* v. *Georgia, supra,* 394 U.S. at p. 567 [22 L.Ed.2d at p. 551].) Moreover, irrespective of obscenity's effect on conduct, censorship is simply impermissible as a preventative measure to enforce the criminal law: ". . . if the State is only concerned about [literature] inducing antisocial conduct, we believe that in the context of private consumption of ideas and information we should adhere to the view that '[a]mong free men, the deterrents ordinarily to be applied to prevent crime are education and punishment for violations of the law. . . .' " (394 U.S., at pp. 566-567 [22 L.Ed.2d at p. 550].)

The *Stanley* court rejected as well the state's attempt to justify suppression in order to foster morality among its citizens: ". . . Georgia asserts the right to protect the individual's mind from the effects of obscenity. We are not certain that this argument amounts to anything more than the assertion that the state has the right to control the moral content of a person's thoughts. To some, this may be a noble purpose, but it is wholly inconsistent with the philosophy of the First Amendment." (Fn. omitted.) (394 U.S., at pp. 565-566 [22 L.Ed.2d at p. 550].)

Ultimately, the proponents of censorship must rely, almost exclusively, upon a vague if vigorously asserted state interest in the preservation of a "desirable" moral tone and climate in society.[18] Yet this proffered governmental purpose is equally incompatible with the First Amendment, for it suggests that the right to receive information and ideas is limited to expression found acceptable by the majority.

The "right to receive," however, has never been conditioned upon public tolerance for the form or content of the proffered communication. "Plainly a community cannot suppress, or the state tax, the dissemination of views because they are unpopular, annoying or distasteful." (*Murdock* v. *Pennsylvania* (1943) 319 U.S. 105, 116.) Similarly, the freedom to disseminate information to receptive citizens may be protected even

---

[18]The majority in *Paris Adult Theater I* v. *Slaton, supra,* characterized this interest in the following terms: "Quite apart from sex crimes, however, there remains one problem of large proportions aptly described by Professor Bickel: 'It concerns the tone of the society, the mode, or to use terms that have perhaps greater currency, the style and quality of life, now and in the future. A man may be entitled to read an obscene book in his room, or expose himself indecently there. . . . We should protect his privacy. But if he demands a right to obtain the books and pictures he wants in the market, and to foregather in public places—discreet, if you will, but accessible to all—with others who share his tastes, *then to grant him his right is to affect the world about the rest of us, and to impinge on other privacies. . . .*'" (Italics in original, fn. omitted.) (415 U.S., at pp. 58-59 [37 L.Ed.2d at pp. 457-458].)

where the means of distribution is sometimes "a nuisance or a blind for criminal activities." (*Martin* v. *City of Struthers, supra,* 319 U.S. 141, 145 [87 L.Ed. 1313, 1318].) Given a fundamental right to receive information and ideas regardless of their social worth, that right clearly is not defeasible upon a showing that some find its exercise distasteful.

Whatever the power of the state to regulate the public distribution of sexually explicit material for the purpose of protecting the privacy of nonconsenting adults, this power does not extend, in my view, to the suppression of communication between consenting parties, merely because others—not themselves exposed to the undesired communication—are nonetheless offended by the fact that the communication occurs. "The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections." (*Cohen* v. *California, supra,* 403 U.S. 15, 21 [29 L.Ed.2d 284, 291-292].)

Finally, a governmental effort to impose a societal standard of morality by restricting the ability of individuals to obtain entertainment or satisfaction out of any form of expression that appeals to them, absent a concrete showing of harm, runs contrary to the fundamental right of privacy that is lodged in the "penumbra" of the Bill of Rights (see *Griswold* v. *Connecticut, supra,* 381 U.S. 479; *Eisenstadt* v. *Baird* (1972) 405 U.S. 438 [31 L.Ed.2d 349, 92 S.Ct. 1029]; *Roe* v. *Wade* (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705]; *Stanley* v. *Georgia, supra,* 394 U.S. 557; *Olmstead* v. *United States* (1928) 277 U.S. 438 [72 L.Ed. 944, 48 S.Ct. 564, 66 A.L.R. 376] (Brandeis, J. dissenting), and is now explicitly guaranteed by the California Constitution (art. I, § 1).

Underlying these decisions lies the common theme that, unless demonstrable harm can be shown, the state may not restrict an individual's behavior as to certain intimate matters merely on the basis of ancient taboos and commonly held views of morality. "Like the proscription of abortions, the effort to suppress obscenity is predicated on unprovable, although strongly held, assumptions about human behavior, morality, sex, and religion. The existence of these assumptions cannot validate a statute that substantially undermines the guarantees of the First Amendment. any more than the existence of similar assumptions on the issue of abortion can validate a statute that infringes the

constitutionally protected privacy interests of a pregnant woman." (*Paris Adult Theater I* v. *Slaton, supra*, 413 U.S. 49, 109-110 [37 L.Ed.2d 446, 488] (Brennan, J. dissenting).)

The fundamental difficulty with legislation that would suppress obscenity is that it attempts to codify ever-changing and elusive social mores. Society itself is convulsed in a contradiction of approaches: it is torn between deeply felt moral exhortations that sexual fulfillment is sinful and the widely held Freudian teaching that the very lack of such fulfillment is, as to the individual's emotional wellbeing, sinful. In the wake of these attitudes the Legislature frames its enactments in broad generalities and loose terminology that can hopefully satisfy both contentions. The result of these efforts becomes legislation that is so distended that it is unenforceable.

In this undertaking the courts and legislators must deal with a public opinion that is as restless and changing as the waters of the ocean: the would-be legislative and judicial King Canutes must fail in ordering back the waves of a cultural revolution.

In fixing the constitutional limits of this legislation the court must therefore recognize the limited nature of the legal process. As I have explained, I would hold back the sweep of the prohibition here to the enforceable and reasonable goal of the protection of the viewing but nonconsenting public. I realize that to some persons pornographic depiction is repulsive; to others the prohibition of it threatens intrusion upon constitutionally protected free expression, and incurs the danger that the suppression may spill over to inhibit the political protest that surely should be protected. Perhaps ultimately the courts must recognize that each protagonist in this field makes a point—that the single citizen has as much constitutional right to view the erotic creations of a Blake, Picasso, or Bosch in privacy as the general citizenry has the right not to see such erotica depicted on public billboards.

Finally, I urge the acceptance of a limited range of inhibiting legislation in this field because the past attempt at a more ubiquitous prohibition has not only been wasteful but harmful. It has been wasteful in that it has consumed law enforcement resources that could have better been devoted to combat more serious crime. No better or more convincing statement of this misdirection of public energy and resources can be found than the late Professor Packer's classic exposition The Limits of the Criminal Sanction (1968), particularly pages 316 to 328. But

the loose use of the criminal process for these purposes has been worse than wasteful: its obvious failure, which is manifest to any casual observer of book stores or motion picture theaters in our metropolitan areas, has brought the law itself into disrepute. The impotence of courts to enforce their grandiloquent if contradictory rulings on this subject inevitably leads to the conclusion that other criminal sanctions cannot or will not be enforced and therefore may safely be disregarded.

In view of these considerations, I believe that the Penal Code's intrusion upon the individual's fundamental right to receive information and ideas cannot stand. To yield to the fear that a "moral" society cannot be maintained unless the state chooses the books we may read and the movies we may watch is to reject the fundamental premise of the First Amendment, the premise that freedom of expression, in the absence of demonstrable harm, leads ultimately toward enhanced human dignity and social progress rather than vulgarity and decay. We may personally take displeasure in the type of expression which some individuals seek, but it is precisely the purpose of the First Amendment to forestall governmental enforcement of that displeasure by use of the criminal law.

I would reverse the judgment.

Mosk, J., concurred.